EDWARD CLIFFORD v. WILLIAM HELLER, SHERIFF.

Argued November 8, 1898—Decided January 4, 1899.

1. The legality of the proceedings at the trial of a prisoner convicted of a crime by a court of competent jurisdiction cannot be challenged or reviewed by *habeas corpus.*

2. On a writ of *certiorari* allowed with the writ of *habeas corpus* to bring up a warrant for the execution of the prisoner purporting to be issued by the executive department of the state government under authority of the act of April 16th, 1846, the court will adjudge whether such warrant is valid.

3. When the governor of the state resigns, the powers, duties and emoluments of the office devolve, under the constitution, upon the president of the senate, but he does not thereby become the governor of the state in the constitutional sense; the president of the senate retains his office of senator, and as president of the senate he exercises the powers and performs the duties of the executive department.

4. When he resigns his office as senator he ceases to be president of the senate, and thereupon the powers, duties and emoluments of the executive office devolve in like manner upon the speaker of the house of assembly.

5. The granting of a reprieve and the fixing of a day for the execution of a convicted criminal is by the common law a judicial power, and cannot be exercised by the governor or person administering the government, except in so far as it is expressly permitted by the constitution.

6. The constitution bestows upon the executive department the power to reprieve, but limits the exercise of that power to a period of ninety days after conviction, which means ninety days after sentence in the court below. As an incident to this granted power, the executive department may direct the execution to be proceeded with within the ninety days, and in that event the execution takes place, not by force of the executive warrant, but in virtue of the judgment of the court.

7. After the lapse of the ninety days the power of the executive department in this respect ceases.

On *habeas corpus* and *certiorari* to bring up and review warrant for execution of prisoner.

Before Justices DEPUE, VAN SYCKEL and LIPPINCOTT.

For the prosecutor, *Warren Dixon* and *John P. Stockton.*

For the state, *James S. Erwin,* prosecutor of the pleas, and *Samuel H. Grey,* attorney-general.

The opinion of the court was delivered by

VAN SYCKEL, J.   Edward Clifford was convicted of murder in the first degree in the Court of Oyer and Terminer of the county of Hudson, and sentenced by the said court on the 15th day of September, 1896.

The proceedings at the trial were subsequently taken to the Court of Errors and Appeals for review, and by the judgment of that court the judgment of the Oyer and Terminer was in all respects affirmed.   Thereupon the Court of Oyer and Terminer ordered the said Clifford to be executed on the 16th day of February, 1898.

On the 14th day of February, 1898, Foster M. Voorhees, president of the senate of New Jersey, under his hand and the great seal of the State of New Jersey, directed the sheriff of the county of Hudson to suspend the execution of said death sentence until the 16th day of March, 1898.

Further proceedings were taken on behalf of Clifford in the federal courts by which the execution of sentence was stayed until November 25th, 1898, when David O. Watkins, speaker of the house of assembly of New Jersey, under his hand and the great seal of the state, suspended the execution of said sentence until the 6th day of January, 1899, and ordered the said Clifford to be executed on that day.

Clifford is now before this court on *habeas corpus*, and at his instance a writ of *certiorari* was allowed to bring before the court the proceedings upon which the state claims to rest the order of David O. Watkins, the validity of which is controverted in this case.

Our *Habeas Corpus* act provides that the following, among other persons mentioned, shall not be entitled to prosecute such writ: " Persons committed or detained by virtue of the final judgment or decree of any competent tribunal of civil or criminal jurisdiction, or by virtue of any execution issued upon such judgment or decree, unless such judgment or decree be founded upon contract."

It is clear, therefore, that the legality of the proceedings at the trial of Clifford cannot be challenged or reviewed by writ

of *habeas corpus*, and if the case before us presented no other question it would be the duty of the court to dismiss the writ as improvidently granted.

But the return to the *certiorari* and the facts agreed upon present a question of great importance, in which the validity of the judgment of our courts is in no wise involved. That question is, whether David O. Watkins had the power to order the execution of Clifford. If the warrant issued by him was unauthorized, it is the province and the duty of this court to intervene for the purpose of preventing an unlawful execution of the person condemned.

The admitted facts controlling this controversy are as follows :

On the 31st day of January, 1898, John W. Griggs, then governor of New Jersey, filed in the office of the secretary of state his resignation as governor, to take effect at the termination of that day.

Foster M. Voorhees was then president of the senate of New Jersey, being a senator from the county of Union.

He thereupon took the oath diligently, faithfully and to the best of his knowledge, to administer the government of the state in conformity with the powers delegated to him ; which oath was filed in the office of the secretary of state on the 1st day of February, 1898.

On the 18th of October, 1898, Foster M. Voorhees filed in the office of the secretary of state a paper writing, of which the following is a copy :

" STATE OF NEW JERSEY, EXECUTIVE DEPARTMENT.

"*To the Secretary of State and to the Governor or person administering the government :*

" I hereby resign my commission as a member of the senate from the county of Union.

"FOSTER M. VOORHEES."

David O. Watkins was then a member of the general assembly of the State of New Jersey from Gloucester county, and speaker of the house of assembly.

On the 18th day of October, 1898, he filed in the office of the secretary of state an oath that he would diligently, faithfully and to the best of his knowledge, administer the government of the state in conformity with the powers delegated to him.

It is insisted on behalf of the prosecutor that when Foster M. Voorhees filed in the office of the secretary of state the oath before mentioned, he ceased to be a member of the senate, and became governor of the state for the term fixed by the constitution until another governor should be elected; that his resignation of his seat in the senate was unnecessary, and could not in anywise affect the tenure of his office as governor.

To support this contention the well-settled rule laid down by Chief Justice Kirkpatrick in *State* v. *Parkhurst,* 4 *Halst.* 446, is relied upon, "that if a person holding an office be appointed to and accept another office incompatible therewith, such acceptance of the second is a virtual surrender of and vacates the first."

The argument is that Foster M. Voorhees became governor of New Jersey and ceased thereby to be senator without resigning the latter office. That his subsequent resignation of the senatorship did not operate as a resignation of his office as governor, or in anywise affect his right to hold said office or his duty to execute its prescribed functions.

That under the constitution the office of governor could become again vacant only by the death, resignation or removal of Foster M. Voorhees, and as neither of those contingencies has occurred, there was no vacancy in the office of governor, by which David O. Watkins could succeed to that office.

Assuming the premises of the prosecutor to be entirely sound, it seems to result not only that the resignation of the senatorship by Foster M. Voorhees did not vacate the office of governor, but that the resignation of the senatorship was equivalent to a declaration that he resigned that office and elected to retain the office of governor which he did not resign.

It is well settled, both in England and in this country, that title to an office cannot be challenged on *habeas corpus* or in

any other collateral proceeding.   Where the official is in pos-
session of the office and is executing its powers under color
of title, he will be regarded at least as a *de facto* officer, and
as to the public his official acts will be efficacious.

That rule, so absolutely essential to the stability of govern-
ment and the protection of the governed, should be recognized
in its full force.

The case *sub judice* is peculiar and novel.

The situation is this : If Foster M. Voorhees, as president
of the senate, was transferred, by force of the constitutional
provision, to the office of governor, thereby vacating his office
of senator, he is still governor of New Jersey, in full posses-
sion of the powers of the office, and under obligation to per-
form its duties ; and if he is governor *de jure,* in possession
of the office, David O. Watkins cannot at the same time be
governor *de facto,* and the warrant signed by him is without
the slightest legal value.

All that appears in the case before us is that Governor
Griggs resigned ; that Foster M. Voorhees, president of the
senate, took the oath before stated ; that he subsequently
resigned his office of senator ; that David O. Watkins is
speaker of the assembly and that he took the oath set forth.
No act appears on his part to show that he is *de facto* except
the oath and the signing of the death warrant.   If Foster M.
Voorhees was governor and his resignation of the senatorship
was not a vacation of his office as governor, he must still be
governor, nothing appearing before us except his resignation
as senator to show that he is not still acting and claiming to
act as governor.

We are constrained, therefore, to resort to an interpretation
of the provisions of our state constitution touching this sub-
ject to determine whether David O. Watkins had the right,
either *de jure* or *de facto,* to do the act which has given rise
to this litigation.

The clause of the constitution which provides for the
vacancy in the office of governor is as follows : " In case of
the death, resignation or removal from office of the governor,

the powers, duties and emoluments of the office shall devolve upon the president of the senate, and in case of his death, resignation or removal, then upon the speaker of the house of assembly, for the time being, until another governor shall be elected and qualified; but in such case another governor shall be chosen at the next election for members of the legislature, unless such death, resignation or removal shall occur within thirty days immediately preceding such next election, in which case a governor shall be chosen at the second succeeding election for members of the legislature. When a vacancy happens, during the recess of the legislature, in any office which is to be filled by the governor and senate or by the legislature in joint meeting, the governor shall fill such vacancy and the commission shall expire at the end of the next session of the legislature, unless a successor shall be sooner appointed; when a vacancy happens in the office of clerk or surrogate of any county, the governor shall fill such vacancy, and the commission shall expire when a successor is elected and qualified." *Article* 5, *Clause* 12.

In construing this clause of the constitution it must be borne in mind that it was carefully drawn by learned jurists, who knew how to express with exactness and precision the purpose they had in view.

The provision is that in case of the resignation of the governor, the powers, duties and emoluments of the office shall devolve upon the president of the senate, and not that the president of the senate shall thereby become governor, and hold the title and the office until another governor is elected.

If the framers of the fundamental law had intended to transfer the president of the senate to the executive chair, and thereby to vacate his office of senator, it is reasonable to believe that they would have said so in no uncertain language.

The language used is not ambiguous. It declares that the powers, duties and emoluments of the office shall devolve on the president of the senate. It does not confer upon him the title of the office.

The president of the senate exercises the powers of the

governor, the president of the senate performs the duties of the governor, the president of the senate receives the emoluments of that office.

He is still president of the senate, with the added duties required of the chief executive of the state imposed upon him.

There is no language in the constitution from which it can reasonably be inferred that his office of president of the senate was to be vacated. He retains his office of senator and as president of the senate, and not as governor. He exercises the added powers and performs the superimposed duties.

That such is not only the ordinary acceptation and the reasonable interpretation of the language employed, but also the intention of those who framed this clause, is evinced in other parts of the organic law.

In clauses 9 and 10 of article 5, and clauses 2 and 3 of article 8, this language appears : " The governor or person administering the government."

Why is this language so sedulously used throughout the constitution ?

If the president of the senate becomes governor, and ceases to be senator, he is fitly and accurately described in all those clauses by the word " governor," and therefore the words " person administering the government " are not only unnecessary and superfluous but misdescriptive.

The words " person administering the government " were inserted advisedly to describe the president of the senate, who might be called upon to administer the government, but who would not thereby become or be governor, and in the absence of that language, would not be subject to the clauses referred to.

Again, article 3 of the constitution provides as follows :

" The powers of the government shall be divided into three distinct departments—the legislative, executive and judicial ; and no person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others, except as herein expressly provided."

What is the significance of the words in this clause, "except as herein expressly provided"?

What powers belonging to one department of government were there which it was expressly provided in the constitution might be exercised by one of the other departments?

The framers of this article said by this exception, in unmistakable language, there are some powers belonging to one department of the government which it is expressly provided in this constitution shall be exercised by a person or persons belonging to one of the other departments.

In the constitution we find such a provision, and it is the only one in the constitution except the power to reprieve.

That provision is the one before referred to in clause 12 of article 5, which provides that the president of the senate, or in case of his death, resignation or removal, the speaker of the house, shall exercise the powers of the executive department of the government in the contingency therein specified.

It must, therefore, have been the understanding and intention of the constitution makers, that the executive powers to be exercised by a member of the legislative department were to be exercised in the capacity of a legislator, and that made the exception in article 3 a necessary provision.

But it is argued that the president of the senate is a judge of the Court of Impeachment, and may try himself if he is impeached, and pardon himself if convicted. This is clearly a misconception of the situation.

As president of the senate he performs the duties of the chief executive, and any malfeasance in that respect is as much a violation of his duty as a senator, and as president of the senate, as malfeasance in his purely legislative action would be. If impeached, it would be as a senator, and not as governor.

He would be tried by the senate, which is the trial court in all cases of impeachment. While there is no express provision in the constitution that a member of the senate shall not sit as a judge on his own trial if impeached, he is nevertheless incompetent, and would be excluded. The principle

that a man shall not be a judge in his own case is accepted universally by judicial tribunals.

It is a rule of such fundamental character that it is deemed essential to the well being of society, and underlies the organic law itself.

If any doubt could arise upon this point, a reference to section 3 of article 6 of the constitution should set it at rest.

That section provides that all impeachments shall be tried by the senate, and that the members of the senate, when sitting for that purpose, shall each take an oath "truly and impartially to try and determine the charge in question according to evidence."

It would be the sublimity of folly to attempt to bind a senator by such an oath, when he was sitting in his own case.

If the president of the senate was impeached and convicted, he would cease to be senator and thereupon the powers of the executive would devolve upon the speaker of the house.

The fact that the president of the senate exercises both legislative and executive functions in the view herein taken can have no significance in this discussion, when we advert to the fact that under the first state constitution the governor was not only the chief executive but he was also president of the legislative council, with a casting vote, and presiding judge of the highest court in the state.

The powers of government were more wisely distributed by the constitution of 1844, in which, by article 3, a member of one department could not exercise a power belonging to either of the others, except in the instances where the office of governor became vacant and the power to reprieve was granted.

If anything is needed to establish the correctness of this view, it is found in clause 13 of article 5, which reads as follows: "In case of the impeachment of the governor, his absence from the state or his inability to discharge the duties of his office, the powers, duties and emoluments of the office shall devolve upon the president of the senate; and in case of his death, resignation or removal, then upon the speaker

of the house of assembly, for the time being, until the governor, absent or impeached, shall return or be acquitted, or until the disqualification or inability shall cease, or until a new governor be elected and qualified."

In case of the absence of the governor from the state, precisely the same language is used as in clause 12 in relation to his resignation of the office, and it must necessarily receive the same interpretation.

In case of his absence from the state, " the powers, duties and emoluments of the office shall devolve upon the president of the senate until the governor returns."

Will it be seriously contended that when the governor goes out of the state the president of the senate becomes governor until the duly-elected governor returns, and thereby vacates and loses his office as senator? That such an interpretation of this language would be adopted could not have been within the contemplation of the able men who incorporated it in this clause relating to a matter of supreme importance.

If it is the true construction, then when the senate was composed of ten members of one party and eleven of the other the governor of the state, by the simple device of passing into an adjoining state, could have vacated the seat of one senator and thus have deprived the opposing party of a majority in that branch of the legislature.

In my judgment the framers of the constitution meant simply what they said, that in case the governor resigned the president of the senate as such should have the powers and perform the duties of the office. Foster M. Voorhees did not become governor upon the resignation of Governor Griggs. He still continued to be a senator and president of the senate. He could not resign the office of governor which he never held. When he resigned and vacated the office of senator he ceased to be president of the senate and could no longer exercise the functions pertaining to the executive department.

Therefore, upon his resignation as senator, the powers, duties and emoluments of the office devolved upon David O. Watkins, the speaker of the house of assembly.

He is *de jure* the speaker of the house, and of right as such speaker exercised the executive powers.

He is not governor either *de jure* or *de facto*, in the constitutional sense of that term.

The act of 1898 cannot in any respect affect this controversy.

The question therefore remains to be considered whether the issuing of the warrant for the execution of Clifford was a valid exercise by David O. Watkins of the powers committed to him as speaker of the house of assembly.

By the common law, where the judgment was pronounced in the Oyer and Terminer, a precept for execution was issued to the sheriff in the name and under the hands and seals of the three commissioners before whom judgment was given; but the precepts by justices of the jail delivery need not have been otherwise than by a simple award upon the roll. In later times there was no more done, but after judgment was entered the judges subscribed a calendar in paper directing the several judgments of deliverance to the parties acquitted, or the execution of the parties condemned, of which the sheriff was required to take notice openly in court. 2 *Hale* 409.

It is also quite clear that by the common law the time and place of execution were not named in the sentence; it was left to the judgment and discretion of the sheriff.

The execution of the prisoner was directed by the words "sus. per coll." written against his name in a calendar prepared for the purpose. Mr. Chitty says: "The practice of the present day, at the Assizes, is that when all the other public business of the court is terminated the clerk makes out in writing four lists of prisoners in the separate columns containing their crimes, verdicts and sentences, and a blank column in which the judge writes his pleasure respecting those capitally convicted, as to be executed, respited or transported. If the sheriff receives no special order from the judge he executes the judgment of the law in the usual manner, according to the directions of the calendar." 1 *Chit. Crim. L.* *781.

The only instance of a warrant from the crown was in the case of high treason, where a peer of the realm was tried before parliament. Where all the rest of the judgment save the beheading was pardoned the execution was to be under the great seal. 3 *Co. Inst.* 31 ; 2 *Hale* 409, 412.

In felonies we think it clear that the direction for the execution of the sentence was a judicial act, for these reasons—first, that the judgment of the court was a sufficient warrant ; and secondly, issues extraneous of those raised at the trial might be raised in suspension of the sentence, which required a judicial determination, as for instance, where the convict is a female, she may plead that she is quick with child, and second, if an allegation be made that since the conviction the accused has become insane. In both of these cases, as well as others, there is to be a judicial investigation. 4 *Bl. Com.* 395.

At common law reprieve might be granted either by the king under his power to pardon or by the court, and every court which had power to award execution had power to grant a reprieve. This reprieve was simply a suspension of the sentence.

In *Rex* v. *Harris*, 1 *Ld. Raym.* 482, "counsel urged that in criminal causes where execution is deferred it cannot be awarded without bringing the prisoner to the bar, to which Chief Justice Holt agreed, and he cited Knightly's case, who was indicted for high treason, and being arraigned at bar in the King's Bench confessed the indictment, and judgment of death was pronounced against him in Easter term and execution was countermanded, so that Trinity term passed ; and then in the long vacation they had designed to execute it and upon that all the judges of England met to consider what could be done ; and it was resolved by all, that in regard a term had intervened without execution done, it could not be awarded without bringing Knightly to the bar ; and per Chief Justice Holt it would be the same thing if Trinity term had not passed, but only begun ; so that Knightly was imprisoned

until Michaelmas term, and in the meantime he obtained a pardon."

In Sir Walter Raleigh's case, the question was whether a privy seal was sufficient for execution. It was resolved on a conference between all the judges, that the prisoner ought to be brought to the court and then demanded if he could say anything, &c., and that it was not a legal course that he should be commanded by a privy seal or great seal to be executed without being demanded what he hath to say, &c. *Hutt.* 21.

If the governor can intervene and have execution by virtue of his warrant, the prisoner will be deprived of the right of a judicial determination of matters, which in law are subjects of judicial cognizance.

If the order which shall carry the judgment of the court into effect is one within judicial control, as we deem it to be, then the several constitutional provisions are to be considered. By the constitution of 1776 the governor had no power to pardon or to grant reprieve; whatever power there was in that respect was vested in the governor and council—that is, the Court of Appeals.

Under the power to pardon at common law, the power of the king to reprieve was included, and the power of reprieve was not vested in the governor, but in the governor and council.

By the act of November 16th, 1820, the governor, with the advice of his privy council, had power to suspend execution of the sentence of death until the rising of the next meeting of the governor and council. By the act of 1821, where such a reprieve was granted and a pardon was not granted at the next meeting, it was made the duty of the governor and council to appoint a time for the execution of the criminal. *Elm. Dig.* 118.

By the constitution of 1844, the executive, with the concurrence of the chancellor and of the six judges of the Court of Appeals, or a major part of them, may grant pardons after conviction (*art.* 5, § 10); and by article 9 the executive was

given power to grant reprieve to extend until the expiration of a time not exceeding ninety days after conviction.

By the act of April 16th, 1846, it is provided that where a reprieve is granted by the governor that the governor shall issue his warrant to the sheriff of the proper county commanding him to execute the sentence at such time as shall therein be appointed and expressed.  *Rev., p.* 290, § 123.

Power to reprieve is limited to a postponement of the execution for ninety days after the conviction—that is, after the sentence in the court below.

By article 3 of the constitution of 1844, before set forth, the governor is prohibited from exercising any legislative or judicial power except as in said constitution is expressly provided.

The express provision of the constitution on this subject, so far as concerns the executive, is that he shall have power to suspend the sentence of the court for a period not exceeding ninety days.

The term "reprieve," as used both in the constitution and in the statute, is merely the postponement of the sentence for a time.  It does not and cannot defeat the ultimate execution of the judgment of the court; it merely delays it.

In the exercise of the power to reprieve for ninety days, which is the constitutional limit of that power, the governor has, as an incident to that power, the right to say that at the expiration of that time the sheriff shall no longer be stayed but shall proceed to execute the judgment of the court.

The reprieve, to be in proper form, should fix a day, not exceeding ninety days from the sentence, when it shall expire, and direct the execution to be proceeded with at the expiration of that time.  The execution takes place, then, not by order of the governor, but in virtue of the judgment of the court.  The governor simply says, the prisoner is adjudged to be executed on a certain day; I direct the execution to be postponed until a future day specified, and then the execution is to be proceeded with.

In *Ex parte Fleming*, 60 *Miss.* 910, the court said : " The power to respite necessarily carries with it the power to fix another and later day for the execution of the death sentence, since the respite is nothing more than a suspension of the sentence until its own expiration.   The subsequent execution takes place, not by virtue of a new sentence, but by reason of the expiration of the temporary suspension of the original sentence which was caused by the respite." *Sterling* v. *Drake*, 29 *Ohio* 457, is to the like effect.

If there was a doubt in respect to the proper procedure in this respect, the long-continued practice of the executive department to make orders for the execution of sentences, where there has been a reprieve, will justify the construction that such orders may be issued, provided that the time for execution is not extended beyond the ninety days.

That practice, commencing in 1853, has been pursued until the present time.

The order certified into this court was made after the expiration of the ninety days, and is without any legal or constitutional warrant, and must be set aside.

The order made in the case of Martin by Governor Ludlow does not conflict with the views herein expressed.   The reprieve and order were both within ninety days from the time of conviction, and that time having elapsed, Martin was executed, not under the governor's warrant, but under an order made by the Court of Oyer and Terminer.

The traverse of the sheriff's return to the writ of *habeas corpus* must be stricken out, and the prisoner remanded.

Let rules be entered accordingly.

Justices DEPUE and LIPPINCOTT concur.