## *Ex parte* GEO. CRUMP.

No. A-2058. Opinion Filed October 4, 1913.

(135 Pac. 428.)

1. **PARDON—Definition—Effect—Power to Grant.** A pardon is an act of grace and mercy bestowed by the state through its chief executive upon offenders against its laws after conviction, and a full, unconditional pardon reaches both the punishment prescribed for the offense and the guilt of the offender; it obliterates, in legal contemplation, the offense itself; and hence its effect is to make the offender a new man.

2. **SAME—Time of Taking Effect.** A pardon takes effect upon delivery either to the person who is the subject of the favor or to some one acting for him or in his behalf.

3. **CONSTITUTIONAL LAW—Habeas Corpus—Grounds—Detention After Pardon.** This court has no power to control or in any manner interfere with the functions of the executive department of the state government, but it has jurisdiction and power to inquire upon habeas corpus into the validity of a pardon under which the petitioner seeks to be discharged from the penitentiary, where after the delivery of the pardon he is detained in the custody of the warden upon an order of the Governor, purporting to revoke the pardon.

4. **PARDON—Power to Grant—Revocation.** The pardon in this case was granted by the Lieutenant Governor, acting as Governor in the absence of the Governor from the state. **Held,** that under the Constitution, art. 6, sec. 16 (165, Williams'), in the absence of the Governor from the state for any purpose or for any

period of time, the constitutional functions of his office devolve **pro tempore** upon the Lieutenant Governor, and a pardon granted and delivered by the Lieutenant Governor as acting Governor, in the absence of the Governor from the state, is a valid and effectual pardon. A **fortiori** the warden had no authority to disregard it, and the Governor's order purporting to revoke such pardon was necessarily a nullity.

5. OFFICERS—Pardon—"Officer De Facto." An "officer de facto" is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interest of the public and third persons, where the functions of the office are exercised by one who was in the actual possession of it under color of title.

6. STATES—Governor — Exercise of Executive Authority — "Removal"—"Absent." The word "removal" as used in Const. art. 6, sec. 16, providing that the Lieutenant Governor shall act as Governor in case of the removal of the Governor from the state, and the word "absent" as used in section 15, providing who shall act as Governor in case of a vacancy while the Lieutenant Governor shall be absent from the state, are convertible terms, the two sections being in **pari materia**; and hence the former term does not contemplate a permanent removal.

Application of George Crump, Jr., for writ of *habeas corpus*. Writ allowed, and petitioner discharged.

On behalf of George Crump, Jr., a duly verified petition for a writ of *habeas corpus* was presented to the Presiding Judge of this court, representing that he was illegally restrained of his liberty and unlawfully imprisoned in the state penitentiary by R. W. Dick, warden. It is further averred in said petition that:

"The cause of said restraint according to the best of the knowledge and belief of your petitioner is that the said George Crump, Jr., was by the superior court of Pottawatomie county, Okla., convicted of the crime of forgery, said conviction on appeal to this honorable court was affirmed (7 Okla. Cr. 535, 124 Pac. 632), and said petitioner sentenced to said penitentiary for a period of seven years, said term of imprisonment commencing. on June ——, 1912, but your petitioner alleges that said restraint is illegal and unauthorized because he says that on the 2d day of August, 1913, the Honorable Lee Cruce, Governor of Oklahoma, being absent from the state of Oklahoma, to wit, at Kansas City, Mo., the Honorable J. J. McAlester, Lieutenant Governor of the state of Oklahoma, during the absence of Governor Cruce from the state of Oklahoma, and while Governor

Cruce was still absent from the state of Oklahoma, granted your petitioner a full, complete, and unconditional pardon for the offense of which he was convicted, as above set forth, said pardon being signed by the said J. J. McAlester, acting Governor of the state of Oklahoma, and sealed with the great seal of the state of Oklahoma, and attested by Benjamin F. Harrison, Secretary of the state of Oklahoma, which said pardon was then and there delivered to the father of your petitioner, who was and is acting for and in his behalf. A duplicate of said pardon is hereto attached and asked to be taken and considered as a part of this petition."

The duplicate of said pardon is as follows:

"State of Oklahoma, Executive Department. The Acting Governor of the State of Oklahoma, to All Who Shall See These Presents—Greeting: Know ye, that I, J. J. McAlester, Lieutenant Governor of the state of Oklahoma, and as such the acting Governor of the state of Oklahoma in the absence from said state of the Hon. Lee Cruce, Governor of the state of Oklahoma, do hereby, under and by virtue of the authority vested in me by the Constitution of the state of Oklahoma, grant unto George Crump, Jr., who was convicted at the January, 1911, term of the superior court of Pottawatomie county, Oklahoma, of the crime of forgery and sentenced to imprisonment in the state penitentiary at McAlester, Oklahoma, for the term of seven years, a full, complete and unconditional pardon for the offense of which he was convicted as aforesaid. In witness whereof, I have hereunto set my hand at Oklahoma City, the capital, this 2d day of August, 1913, and do hereby direct the Secretary of State forthwith to affix the great seal of the state of Oklahoma hereto and to attest the same with his signature. J. J. McAlester, Acting Governor of the State of Oklahoma. [Seal.] By the Governor, Benjamin F. Harrison, Secretary of State."

A writ of *habeas corpus* was issued by Presiding Judge Armstrong directed to the respondent, who on August 14th, the day it was returnable, produced the petitioner in court and at the same time filed his return, which in part is as follows:

"Respondent denies the allegation in petitioner's application filed herein that he has been pardoned of the offense of which he was convicted and states that the purported pardon attached to the petition is void in that it was attempted to be granted without authority of law by the Lieutenant Governor of the state

at a time when the Governor of said state was qualified and acting and when the occasion contemplated by the Constitution for the Lieutenant Governor to act as Governor had not arisen. And respondent says that on July 31, 1913, Lee Cruce, Governor, left the state of Oklahoma and went to Kansas City, Mo., to be temporarily absent from the state of Oklahoma for one day, nor was he at said time in any way incapable of discharging the powers and duties of the office of Governor of the state of Oklahoma, nor did he remove from the state of Oklahoma, nor did the said Governor before leaving the state, or at any time during his temporary absence therefrom, request or in any manner indicate to the Lieutenant Governor any desire on the part of the Governor that the said Lieutenant Governor should perform the functions of the office of Governor during said temporary absence, nor did the said Governor at any time during his temporary absence abdicate the duties of the office of Governor of the state of Oklahoma, but before leaving the state of Oklahoma the said Governor informed the chief clerk of the Governor's office as to his whereabouts and gave said chief clerk instructions that, if any matter involving executive action should be presented, he should immediately communicate with the said Governor so that same might properly be attended to; that during said temporary absence the said Governor was within twelve hours run of the capital of the state of Oklahoma and within nine hours run of the boundary of said state of Oklahoma; that the said Governor returned to Oklahoma and arrived within the boundaries of said state about 5:10 o'clock a. m. on the 3d day of August, 1913, and before the purported pardon was delivered to any person, arriving at the capital of the state at the hour of 9:05 a. m. on said 3d day of August, 1913; that upon the arrival at the capital of Oklahoma on the 3d day of August, 1913, of Lee Cruce, Governor, about 9:30 o'clock a. m., he revoked the attempted pardon of George Crump, Jr., and immediately directed respondent herein to disregard any such pretended pardon which might be delivered to respondent, further directed the respondent to hold the petitioner herein under the judgment hereinbefore mentioned. A copy of which order revoking the pretended pardon is hereto attached, marked Exhibit B and made a part hereof. Which said order of revocation was received by this respondent prior to any presentation to him of said pretended pardon issued by Lieutenant Governor McAlester."

The executive order of revocation is as follows: Exhibit B:

"State of Oklahoma, Executive Department. The Governor of the State of Oklahoma, to All to Whom These Presents Shall Come—Greeting: Whereas, on the second day of August, 1913, J. J. McAlester, Lieutenant Governor of the state, issued an order undertaking to grant unto George Crump, Jr., of Oklahoma, who was convicted at the term of the superior court of Pottawatomie county, Oklahoma, of the crime of forgery, and was sentenced to imprisonment in the state penitentiary at McAlester, Oklahoma, for the term of years, a full, complete, and unconditional pardon for the offense of which he was convicted as aforesaid; and, whereas, the purported pardon has not yet been delivered to the said George Crump, Jr., and has not yet become effective and is yet under the control of the Governor of the state: Now, therefore, I, Lee Cruce, Governor of the state of Oklahoma, by virtue of the authority vested in me by the Constitution and laws of this state, do hereby revoke the order tendered by J. J. McAlester in the case and direct the warden of the penitentiary to return to the office of the Governor of Oklahoma all papers issued by the said J. J. McAlester attempting to pardon the said George Crump, Jr., and I hereby expressly revoke any pardon or attempted pardon granted by the said J. J. McAlester while attempting to act as Governor of this state in granting unto the said George Crump, Jr., a pardon as aforesaid. In witness whereof, I have hereunto set my hand at Oklahoma City, the capital of the state, this, the third day of August, 1913, and caused the great seal of the state of Oklahoma to be hereto affixed and the same to be attested by the signature of the Secretary of State. Lee Cruce, Governor of the State of Oklahoma. [Seal.] Attest: Benjamin F. Harrison, Secretary of State."

The undisputed facts shown by the testimony upon the hearing are that George J. Crump, petitioner's father, acting for him as his agent and attorney, received the pardon in question on the 2d day of August, after the same had been attested by the Secretary of State, under the great seal of the state, and it was so delivered by the acting Governor at the executive office, but was not presented to the respondent, warden of the penitentiary, until after he had received the executive order of revocation.

Counsel for petitioner also filed an exemplification of records of the office of Secretary of State showing official acts of Lieutenant Governor Bellamy, acting as Governor in the years 1908 and 1910 while C. N. Haskell, Governor, was temporarily

absent from the state, in granting pardons and paroles, requisitions issued, requisitions honored, and several executive proclamations declaring the result of certain special county seat elections, also about 200 notary public appointments made at said times, and further showing official acts of Lieutenant Governor McAlester, acting as Governor during the temporary absence of Lee Cruce, Governor, from the state in the year 1911, in granting pardons and paroles and approving bonds and in appointing Jas. W. Steen, of Enid, district judge of the Twentieth judicial district. An affidavit of Governor Cruce was filed, reiterating the facts averred and the conclusions stated in the answer of the respondent.

The case was argued orally by Judge Owen and Judge Richardson, former members of this court, representing the instant parties, and by Mr. Haskell and Mr. Forrest, representing two other persons who had been granted similar pardons. The arguments, unusually able and exhaustive, covered the case in all its phases. Upon the conclusion of the arguments and after a recess consideration of the case, the decision of the court was announced, and the writer, by direction of the Presiding Judge, rendered the opinion of the court; thereupon the writ was allowed and the petitioner released.

*Thomas H. Owen* and *George J. Crump,* for petitioner.

*Charles West,* Atty. Gen., *Smith C. Matson* and *C. J. Davenport,* Asst. Attys. Gen., and *Ames, Chambers, Lowe & Richardson,* for respondent.

*E. G. McAdams, Norman Haskell,* and *R. B. Forrest, amici curiae.*

DOYLE, J. (after stating the facts as above). The power to pardon is an executive power expressly vested by the Constitution of the state in the Governor. He does not hold the power simply because he is the chief executive, but because the sole power to pardon is delegated to his office. Const. art. 6, sec. 10 (159, Williams'). "As human actions are necessarily imperfect, the pardoning power must be vested somewhere in

order to prevent injustice when it is ascertained that an error has been committed." Bouv. Law Dic. see "Pardon." A full, unconditional pardon reaches both the punishment prescribed for the offense and the guilt of the offender. It releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he never committed the offense. It obliterates, in legal contemplation, the offense itself.

The doctrine of the authorities is that:

"In contemplation of law it so far blots out the offense that afterwards it cannot be imputed to him [the convict] to prevent the assertion of his legal rights. It gives him a new credit and capacity and rehabilitates him to that extent in his former position, and hence its effect is to make the offender a new man." (4 Bl. Com. 404.)

*In re Garland,* 71 U. S. (4 Wall.) 333, 18 L. Ed. 366; *Knote v. United States,* 95 U. S. 149, 24 L. Ed. 442; *Young v. Young,* 61 Tex. 191; *State v. Page,* 60 Kan. 664, 57 Pac. 514.

A pardon is an act of grace and mercy bestowed by the state, through its chief executive, upon offenders against its laws. Yet a pardon properly granted is also an act of justice, supported by a wise public policy. While the power to pardon, parole, reprieve, or commute after conviction for offenses against the state is a matter of executive discretion, this discretion should be exercised on public considerations alone. An undue exercise of the pardoning power is greatly to be deplored. It is inexcusable. It is a blow at law and order and is an additional hardship upon society in its irrepressible conflict with crime and criminals. If the Governor believes a law under which the prisoner has been convicted to be unjust or too harsh, still he should not for that reason alone exercise the pardoning power. The duty of mitigating the severity of the law lies with the Legislature. As an officer he should look upon the law as wise and just, whatever may be his private opinion. An abuse of the pardoning power may be so great as to warrant an impeachment of the officer who exercises it.

Says Bishop:

"No official person, whatever his station or the nature of his office, is justified in performing any official acts from private motives or in pursuance of mere private views.  An executive officer, asked to grant a pardon, should neither comply nor refuse merely because he would personally be pleased to see the prisoner suffer or to see him go free.  He should act upon public considerations.  He does not sit as a court of appeal from the Legislature.  If he believes the law under which a prisoner is suffering to be unwise or unjust, still this opinion cannot properly incline him to grant the pardon, because the power which makes and unmakes laws is not in him, and officially he is required to look upon the law as just and wise, however his private opinion may revolt.  * * *  In popular writings we often meet with injuriously false views on this subject.  Nothing can be more pernicious than the opinion, sometimes afloat, which assigns to the President or Governor the authority to pardon without limit and denies to the impeaching power the right to interfere.  The granting of pardons is discretionary in its nature; therefore it is necessarily the more open to control by the impeaching power.  If it comes to be understood that a single man, intrusted with the high function of pardon, can open all the prisons of the country and let every guilty person go free, thus at a blow striking down the law itself and not be himself punished for the high misdemeanor, the most disastrous consequences to liberty and law will sooner or later follow.  Such a conclusion is itself the annihilation of law, and only upon law can liberty repose.  Still this sort of executive abuse will not authorize the courts to decline giving effect to the executive pardon."  (1 Bish. New Cr. L. secs. 922 and 926.)

A full, unconditional pardon takes effect upon delivery either to the person who is the subject of the favor or to some one acting for him or in his behalf.  After delivery, a pardon cannot be revoked.  The authorities, without any conflict whatever, deny to the Governor any such power and hold the pardon, when delivered, to be irrevocable. *In re Williams,* 149 N. C. 436, 63 S. E. 108, 22 L. R. A. (N. S.) 238; *Rosson v. State,* 23 Tex. App. 287, 4 S. W. 897; *Ex parte Powell,* 73 Ala. 517, 49 Am. Rep. 71; *United States v. Hughes,* 1 Bond, 574, Fed. Cas. No. 15,418; *State v. Nichols,* 26 Ark. 74, 7 Am. Rep. 600; *Ex parte Reno,* 66 Mo. 266, 27 Am. Rep. 337.  Indeed, it would not only be contrary to principle that the Governor should be in-

vested with such authority, but the power itself would be of the most dangerous and pernicious character. Great evils would inevitably flow, in ways that may be readily suggested, from the exercise of any such power; and hence, wisely, no such power exists. *Knapp v. Thomas,* 39 Ohio St. 377, 48 Am. Rep. 462.

An abuse of the pardoning power does not authorize the courts to decline to give effect to a pardon, and no court has the power to review the action of the executive in granting a pardon, for that would be the exercise of the pardoning power in part, and any attempt of the courts to interfere with the Governor in the exercise of the pardoning power would be manifest usurpation of authority. Our government is one whose powers, other than those reserved by the people, have been carefully apportioned between three separate co-ordinate departments, the legislative, executive, and judicial, which emanate alike from the people, having their powers alike limited and defined by the Constitution, each of equal dignity, and within their respective spheres of action equally independent, and exclusive in respect to the duties assigned. The language of the Constitution, art. 4 (50, Williams'), is:

"The powers of the government of the state of Oklahoma shall be divided into three separate departments, the legislative, executive, and judicial; and except as provided in this Constitution, the legislative, executive, and judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."

With these preliminary observations we will proceed to the consideration of the questions presented and state some of the reasons, without elaborating the arguments, which have led us to the conclusions and the decision heretofore announced in this case.

The pardon in question was granted, as appears from the petition and answer thereto, by the Lieutenant Governor,. acting as Governor, in the absence of the Governor from the state. The decisive question in this case is whether the pardon granted by the Lieutenant Governor, acting as Governor, to George Crump, Jr., is valid and effectual so as to entitle him to be released by the warden of the penitentiary, who holds him in confinement

under the judgment and sentence of the superior court of Pottawatomie county.

The provisions of the Constitution porviding for succession to the office of Governor and for the Lieutenant Governor to become acting Governor and for the vacancy of the office of Lieutenant Governor are as follows:

"If, during a vacancy of the office of Governor, the Lieutenant Governor shall be impeached, displaced, resign, die or be absent from the state, or become incapable of performing the duties of the office, the president, *pro tempore,* of the Senate, shall act as Governor until the vacancy be filled or the disability shall cease; and if the president, *pro tempore,* of the Senate, for any of the above enumerated causes, shall become incapable of performing the duties pertaining to the office of Governor, the Speaker of the House of Representatives shall act as Governor until the vacancy be filled or the disability shall cease. Further provisions for succession to the office of Governor shall be prescribed by law." (Article 6, sec. 15 [164, Williams'].)

"In case of impeachment of the Governor, or of his death, failure to qualify, resignation, removal from the state, or inability to discharge the powers and duties of the office, the said office, with its compensation, shall devolve upon the Lieutenant Governor for the residue of the term or until the disability shall be removed." (Article 6, sec. 16 [165, Williams'].)

Counsel for petitioner contend that, by the express terms of the foregoing provision of the Constitution, the Lieutenant Governor was not only Governor *de facto,* but *de jure,* in the exercise of the powers and duties of that office, and might rightfully and lawfully assume and exercise all executive functions during the temporary absence of the Governor from the state. The sole argument against this contention is that the authority to act as Governor on such contingency is not given in terms, and counsel for respondent cite the cases of *State ex rel. Warmoth v. Graham,* 26 La. Ann. 568, 21 Am. Rep. 551, and *State ex rel. Crittenden v. Walker,* 78 Mo. 139, in support of their position.

The Warmoth case was a proceeding by mandamus to compel the State Auditor to pay the warrant of the Governor for his salary from the 6th to the 19th of May and from the 26th of June to the 17th of July, 1871. The Auditor refused to pay

this warrant on the ground and for the reason that during said periods the Governor was absent from the state, and that the duties of the Governor as well as his salary devolved upon the Lieutenant Governor to whom the salary had been paid. Under the Constitution of Louisiana it is provided that, in the absence of the Governor from the state or his inability to discharge the duties of the office, the powers and duties as well as the salary of the office devolve upon the Lieutenant Governor. It was held in that case that it was the duty of the Auditor to pay the warrant.

The Crittenden case was a proceeding by mandamus, and the only question presented was: Can the Governor, who absents himself from the state for the purpose of performing duties imposed upon him by the Constitution and laws of the state, be deprived of his salary during such absence? It was held that the Lieutenant Governor was not entitled to receive the salary of the Governor's office during such absence.

In these cases no question as to the validity of the executive acts of the Lieutenant Governor was raised. Clearly they are not authority in support of a collateral attack on the official acts of a *de facto* Governor, for the salary of an officer can be recovered on the strength of a title of a *de jure* officer, although he has not performed the duties of the office, and a *de facto* officer cannot recover the salary of the office, although his official acts are valid. Constantineau on the De Facto Doctrine, secs. 220 and 236. To entitle one to claim the emoluments of an office he must show, if his right be questioned, that he is an officer *de jure*. 29 Cyc. 1393.

That the decision in these cases is not applicable is settled by the case of *State ex rel. Attorney General and Carey v. Barrow,* 29 La. Ann. 243, a case to test title to the office of tax collector, where one Carey was removed and Barrow appointed by the Lieutenant Governor, acting as Governor in the absence of the Governor from the state, and the Supreme Court of Louisiana held that:

"The Governor has discretionary power to remove a tax collector and appoint his successor. In the absence of the Gov-

ernor from the state, the Lieutenant Governor has a similar power."

And in the opinion say:

"The case contemplated by the Constitution had occurred, and, whatever power could have been exercised by the Governor had he been present, the same could have been lawfully exercised by the Lieutenant Governor in his absence."

It is submitted by counsel for petitioner that a pardon grant- ed by a *de facto* Governor is valid.

An "officer *de facto*" is one whose acts, though not those of a lawful officer, the law, upon principles of policy and jus- tice, will hold valid so far as they involve the interest of the public and third persons, where the duties and functions of the office are exercised by one who was in the actual possession of it under color of title. Numerous authorities are collated in the case of *Mitchell v. Carter,* 31 Okla. 592, 122 Pac. 691, and in the opinion, adopting the language of Chief Justice Fuller in *Re Ward,* 173 U. S. 452, 19 Cup. Ct. 459, 43 L. Ed. 765. it is said:

"The result of the authorities is that the title of a person acting with color of authority, even if he be not a good officer in point of law, cannot be collaterally attacked."

This principle is recognized as applicable to pardons granted by a Governor *de facto,* and a pardon granted by a Governor *de facto* is valid. *Ex parte Norris,* 8 S. C. 471.

In the case of *Territory v. Richardson,* 9 Okla. 579, 60 Pac. 244, 49 L. R. A. 440, the pardon was granted by the Secretary of the Territory, acting Governor in the absence of the Governor from the territory. And see *Powers v. Commonwealth,* 110 Ky. 386, 61 S. W. 735, 53 L. R. A. 245.

In all regular governments there is no *interregnum,* and there should always be some one capable of administering the laws at the head of the government. The *de facto* doctrine orig- inated in England centuries ago and was carried so far with respect to the English crown that treasons committed under Henry VI (a King "in deed and not in right"), not in aid of the lawful claimant, were punished under Edward IV. Bacon says that "it hath been settled that all judicial acts done by

Henry VI, while he.was king, and also all pardons of felony and charters of designation granted by him, were valid." Bacon's Abr. Prerogative, A; Constantineau on the De Facto Doctrine, sec. 5. On the same principle, when the power of Cromwell was overturned and Charles II restored, the judicial decisions under the former remained unmolested and the judiciary went on as before, still looking only to the *de facto* government for the time. being. Hale's History of the Com. Law.

As we think the validity of the pardon in question is sustained on higher and more satisfactory grounds than the *de facto* doctrine, it would subserve no useful purpose to further discuss this phase of the case.

It is also contended by counsel for petitioner that the contemporary construction of these provisions of the Constitution by the executive department and judicial acquiescence therein fixes the construction. From force of circumstances and conditions necessarily arising in the administration of the affairs of the government, both state and national, it is evident that those who are charged with official duties, whether executive, legislative, or judicial, must necessarily construe the Constitutions and laws in numerous instances. *Marbury v. Madison,* 1 Cranch, 137, 2 L. Ed. 60. Every department of the government, invested with certain constitutional powers, must in the first instance, but not exclusively, be the judge of its powers, or it could not act; and this practical construction by officials or departments outside of the judiciary may or may not be final, according to the circumstances and nature of each particular case.

This court takes judicial notice of the uniform construction placed by the executive department upon these constitutional provisions. This court judicially knows that from time to time, beginning almost immediately after statehood, the Lieutenant Governor has always been the acting Governor in the temporary absence of the Governor from the state and as such granted pardons, appointed and commissioned officers, including one of the present district judges of this state, issued proclamations creating cities of the first class and declaring the results of special elections to relocate county seats, issued and honored requisitions,

appointed notary publics, and performed other executive acts, none of which have been questioned until the present time. On none of these occasions was there any pretense that anything prevented the Governor from exercising the powers and performing the duties of the office, except his mere temporary absence from the state. And when, as acting Governor he pardoned petitioner and four others, the Secretary of State recognized the Lieutenant Governor as the acting Governor of the state, as is evidenced by the attestation with his signature and the great seal of the state. And all executive acts heretofore performed by the Lieutenant Governor, as acting Governor in the absence of the Governor from the state, have been recognized by all the departments of the state government and by the public generally as valid and binding. The court also takes judicial notice that Hon. Henry S. Johnston, president *pro tempore* of the First Senate, and Hon. J. C. Graham, president *pro tempore* of the Second Senate, have each acted as Governor during the coincident absence of the Governor and the Lieutenant Governor from the state and at such times performed the duties of that office. In all cases before the *nisi prius* and appellate courts arising on matters relating to and connected with the official acts of the Lieutenant Governor as acting Governor, there has been a judicial acquiescence in this contemporaneous construction. The doctrine of the authorities is that contemporaneous and practical construction of constitutional provisions by the executive department will be considered by the courts in passing upon constitutional questions; and while they are not bound by such construction, except as to questions of a discretionary character, yet in all cases where there is doubt as to the meaning of such a provision, the courts will adopt and follow contemporaneous and practical construction by the officers whose duty it is to execute it, unless such construction is clearly erroneous.

It is evident that to reverse a construction put upon a constitutional provision by the department charged with its execution, after it has received such practical construction for any length of time, would be to occasion great injury to those who would be affected by such a change. 8 Cyc. 736, and cases

noted; Cooley's Const. Lim. p. 67. The Supreme Court of this state has repeatedly recognized this doctrine. In the case of *League v. Town of Taloga,* 35 Okla. 277, 129 Pac. 702, it is stated as follows:

"The construction placed on statutes or constitutional provisions by officers in the discharge of their duties, either at or near the time of the enactment, which has been long acquiesced in, is a just medium for its judicial interpretation."

And see *Foote v. Town of Watonga,* 37 Okla. 43, 130 Pac. 597; *M., O. & G. v. State,* 29 Okla. 640, 119 Pac. 117; *State v. Hooker,* 26 Okla. 460, 109 Pac. 527. Says the Supreme Court of Oregon:

"In all cases where those persons whose duty it is to execute a law have uniformly given it a particular construction, and that construction has been acquiesced in and acted upon for a long time, it is a contemporary exposition of the statute, which always commands the attention of the courts and will be followed unless it clearly and manifestly appears to be wrong." (*Kelly v. Multnomah County,* 18 Ore. 356, 22 Pac. 1110.)

And see *Brown v. United States,* 113 U. S. 568, 5 Sup. Ct. 648, 26 L. Ed. 1079; *Hovey v. State,* 119 Ind. 386, 21 N. E. 890; *Stuart v. Laird,* 1 Cranch, 299, 2 L. Ed. 115.

The right and duty of the judiciary to take jurisdiction and decide cases when constitutional questions are presented are both imperative and inseparable, and the authoritative exposition of the Constitution will be found in the decisions of the appellate courts. The highest function of this court is to pass upon constitutional questions arising in cases involving the life and liberty of the citizen. This is the first time that a question involving the construction of section 16, art. 6, of our Constitution, has been presented to the courts. The Constitutions of nearly all the states have similar provisions, but we have been unable to find any express adjudication construing the same, for the simple reason, as we suppose, that the language used is so clear and unmistakable and the intention so plain that it has not been questioned. The constitutional provisions already quoted are *in pari materia* and should be considered together. Impeachment of the Governor, his death, failure to qualify, or resignation, involves

necessarily a vacancy in the office, and, if any one of said events occur, the right of the Lieutenant Governor to act is not open to question or doubt; and if, during a vacancy in the office of Governor, the Lieutenant Governor shall be impeached, displaced, resign, or die, then the right of the president *pro tempore* of the Senate to act as Governor is unquestionable. The question therefore arises upon the construction to be placed upon the latter clause of section 16. The language is as follows:

" * * * Removal from the state, or inability to discharge the powers and duties of the office, the said office, with its compensation, shall devolve upon the Lieutenant Governor for the residue of the term or until the disability shall be removed."

The offices of Governor and Lieutenant Governor are created and their tenure, compensation, powers, duties, and functions are prescribed by the Constitution, and it is ordained that:

"The supreme executive power shall be vested in a chief magistrate, who shall be styled 'the Governor of the state of Oklahoma.'" (Article 6, sec. 2 [151, Williams'].)

The duty of the courts in construing constitutional provisions is to give effect to the intent of the framers and of the people in adopting the same, and, whenever it is possible to do so, each provision must be construed so that it shall harmonize with all others, to the end that the intent may be ascertained and carried out and effect given to the instrument as a whole. In all cases where the meaning is clear and unambiguous, the question is not what was the intention, but what is the meaning of the language used.

Much stress is put upon the word "removal," as used in section 16, and counsel for respondent contend that the meaning of this word as used contemplates the permanent removal of the Governor from the state. We cannot agree with this contention. The word "removal," as used in section 16, and the word "absent," as used in section 15, are convertible terms. In Black's Law Dictionary, "absence" is defined as "the state of being absent, removed, or away from one's domicile or usual place of residence."

In the case of *People v. Wells,* 2 Cal. 198, the precise question before us was not presented, but Mr. Justice Anderson in

his opinion, discussing constitutional provisions almost identical, said:

"The latter clause of the sixteenth section of the fifth article makes provision for the vacancy of the office of Lieutenant Governor. It sums up all causes of vacancy and, whether permanent or temporary, classes them under that head and by that single word. The recital of the language will enforce what I state. I repeat the clause: 'If, during the vacancy of the office of Governor, the Lieutenant Governor shall be impeached, displaced, resign, die, or become incapable of performing the duties of his office, or be absent from the state, the president of the Senate shall act as Governor, until the vacancy be filled, or the disability shall cease.' Here the word 'vacancy' is used both in a permanent and temporary sense. It may be absolute or become contingent .upon the determination of the disability. It is. previously provided that there shall be a Lieutenant Governor elected at the same time and place and in the same manner as the Governor, and only one Lieutenant Governor, as there are only three judges. But he may become incapable of performing his duties, or be absent, and so be under disability; and during this time another shall take his place. When, however, that disability ceases, he retakes his place; and from whence does he come? From that temporary vacancy. He was living, but out of his functions, either incapable or absent, and therefore disabled from the performance of his duties. It would have been absurd to have created that, or any other office, not subject to a temporary vacancy. That would have been the excess and folly of reverence and staid respect for the man, without the consideration for the public interests, to be found in the utility and necessity of the functions of the office. This train of incidents and reasonings runs through all the Constitution in relation to offices, their number, how to be occupied, how determined, and by what methods the functions shall always be kept in action. Thus the Constitution sustains the only practical doctrine, as laid down, that the vested rights of the tenure of the term attaches to the person of the elected incumbent, but that the functions of the office, in certain contingencies, separate from him temporarily and adhere to a distinct class of powers within its department for the use, benefit and protection of that great public for which the government was created. Thus, also, the Constitution has established the interpretation of the word 'vacancy' to be, as used in it, that it means either permanent or temporary. The cause and the reason go together. The absence or incapacity of performance produces the disability; the

vacancy of the functions, for so long, follows; when the former ends, the latter are resumed by the original incumbent. For all this, the Constitution has used the word 'vacancy.' There it stands. There is no getting around it. It is the only truth; the solid and impregnable ground of the Constitution, not incidentally formed, but constructed for a particular purpose, with premeditation, thought, wisdom, and that good, practical common sense which the objects and the occasion demanded. But I am not done with the support even in this very place of the Constitution; and, although I do not think it necessary, I hold it to be my duty to add every rivet which may make the work more secure. The seventeenth, being the next section after that I have already quoted, declares that: 'In case of the impeachment of the Governor, or his removal from office, death, inability to discharge the powers and duties of the said office, resignation, or absence from the state, the powers and duties of the office shall devolve upon the Lieutenant Governor for the residue of the term, or until the disability shall cease.' There are two things which this still further demonstrates: First, that the Constitution never lost sight of the proposition that a temporary vacancy might occur in the functions of an office, while the tenure of it was held by the stated incumbent; that in such event another might fill it; and that, when the disability ceased, the former should resume his constitutional functions. Can anything be plainer than this? Second, that the first section provides there shall be but one Governor, as there should be only three judges of the Supreme Court; but the section under consideration contemplates certain contingencies which may cause a temporary vacancy of the functions of his office, and, though he be living and holding the tenure of the term, another may occupy and administrate the functions. Thus the same idea is maintained throughout the Constitution, as applied to the very highest officer known to it. The mistake committed, usually, in forming an opinion upon this consists, as I have stated, in not drawing the proper distinction between the tenure of the term, which attaches to the person of the incumbent, and the functions of the office, which, under certain circumstances, he may exercise, but which belongs to the sphere of a department for the right as well as the good of the people. From that sphere they cannot be separated. The Constitution, we find, makes that distinction. The law makes it. The policy of all governments has made it. The usages of all civilized nations have incorporated it."

In the same case Chief Justice Murray in his opinion used this language:

"It is said that our Constitution recognizes a temporary vacancy in the office of Governor, and that there cannot be two Governors in the abstract any more than there can be four judges. It is sufficient, by way of answer, to say that the Constitution has declared what shall constitute a temporary vacancy in the office of Governor and provided how the same shall be supplied, while it is silent with regard to every other officer. It is fair to suppose, upon every rule of construction, that, if vacancies for temporary incapacity in other constitutional offices had been contemplated, they would have been provided for."

A careful reading of the provisions (sections 15 and 16 of article 6) will show that the enumeration of the causes of vacancy in the office of Governor is so complete that they are susceptible of a construction which will cover every possible contingency, whether permanent or temporary. In case of a permanent vacancy of the office, the accession of the Lieutenant Governor continues for the residue of the term; if only temporary, until the disability shall be removed. As chief magistrate he has important functions to perform that can never be safely suspended for any period of time. As a convincing demonstration of this, it is only necessary to advert to a few of his powers, functions, and duties. He is commander in chief of the militia and as such represents the reserve force that constitutes the ultimate strength of the laws; and he shall cause the laws of the state to be faithfully executed; he is chairman of the most important state boards; he must issue extradition warrants for fugitives from justice, and a few days' delay would often defeat the ends of justice; without unreasonable delay he must pass upon extradition warrants from sister states; he must approve the official bonds of certain state officers within a time certain; and under section 5970, Rev. Laws 1910, he alone can reprieve or suspend the execution of a judgment of death beyond the time allowed by the trial court to perfect an appeal to this court, when the appeal has not been taken within the time allowed. See *Opinion of the Judges,* 3 Okla. Cr. 315, 105 Pac. 684.

The functions of chief magistrate were created for the benefit of the state and are local to it; and, as the constitutional functions of this office cannot be exercised out of the state, the effect of his absence from the state is to suspend his constitutional functions, and thereupon these functions devolve upon the Lieutenant Governor, and he becomes and is *de jure* and *de facto* Governor until the absent Governor returns to the state.

It is further provided by article 6, sec. 15, already quoted, that, if during a vacancy in the office of Governor the Lieutenant Governor shall "be absent from the state, the president *pro tempore* of the Senate shall act as Governor until the disability shall cease, and, if the president *pro tempore* of the Senate be absent from the state, the Speaker of the House of Representatives shall act as Governor until the disability shall cease. In all this there is a perfect consistency pervading both sections. The unequivocal language of the latter clause of section 16 is that, upon his removal from the state, said office shall devolve upon the Lieutenant Governor until the disability shall be removed, and the plain intention of the framers of the Constitution and the people in adopting it was to provide that in his absence from the state for any purpose or for any period of time, however short, his constitutional functions shall devolve upon the Lieutenant Governor as acting Governor. Such absence from the state is an abdication for the time being of the constitutional functions of his office, and the effect of that absence is to suspend his constitutional functions. He does not cease to be Governor by his temporary absence from the state. His vested right of tenure in the term of office attaches to his person and is distinct from his executive functions; it goes with him; but the constitutional functions of his office belong to the public and are confined to the state and cannot be exercised out of the state; when he leaves the state, the constitutional functions of his office devolve *pro tempore* upon the Lieutenant Governor; and, when he returns to the state, *ipso facto,* he resumes all of the powers, functions, and duties of his office, and the Lieutenant Governor, theretofore administering the executive functions temporarily under the Constitution, ceases to be acting Governor.

The true distinction is founded upon the difference existing in the nature of things between a personal vested right of tenure in the term and the functions of the office created in the interest and for the benefit of the public. We think that this is the unmistakable meaning of the language used, and that this construction is alike supported by reason, common sense, public policy, known political truths, and the contemporaneous and practical construction of the respective departments of our state government and is conformable to the history of every state in the Union.

It follows that the pardon granted and delivered by the Lieutenant Governor as acting Governor, in the absence of the Governor from the state, is a valid and effectual pardon. *A fortiori* the warden had no authority to disregard it. As already indicated, the Governor has no power to revoke a full and unconditional pardon that has been delivered; therefore his order purporting to revoke this pardon was necessarily a mere nullity.

It is our opinion that the petitioner is unlawfully restrained of his liberty by the respondent and that he is entitled to a discharge from the imprisonment of which he complains, and he is therefore by the judgment of this court discharged therefrom.

ARMSTRONG, P. J., concurs.

FURMAN, J. (concurring). The facts culminating in this proceeding arose and the writ of *habeas corpus* was issued and the case determined by the court during my absence from Oklahoma City. I therefore did not participate in the consideration of this case prior to its determination. But as the decision of the court has excited some criticism, and as I have no desire to escape full responsibility for any action by the court of which I approve, I desire to say upon a full and thorough investigation I fully concur in the views expressed by Judge Doyle. Any other view would be revolutionary.

STATEMENT BY DOYLE, J. The Governor of the state of Oklahoma, in a letter which was read at the conference of Governors held at Colorado Springs, Colo., explaining his nonat-

tendance there, makes an unfounded and indefensible assault upon the integrity of this court and its decision in this case. His language as published is as follows:

"The Lieutenant Governor seems determined to overthrow all of my policies and to make wholesale delivery of criminals from the penitentiary. The Criminal Court of Appeals in this state has joined hands with the Lieutenant Governor in this raid on the penal institutions by holding that the moment I leave the state, even if my absence extends. only five minutes, the' Lieutenant Governor can do as he pleases. Under these conditions, it would be a crime for me to leave Oklahoma."

This emanation of official arrogance and vindictive malevolence received nation-wide publicity through the public press. The reason, we suppose, is that the spectacle of a Governor publicly assailing a high court of his state is without precedent in the annals of the republic.

It may be said that this uncalled for and unjust reflection upon the court could do no permanent injury to a court strong in the consciousness of its own integrity and strong in the respect and confidence of the people of the state, and therefore it was unworthy of notice, and the wise course would be to ignore it. But, as a member of the court and the judge who delivered the opinion, I feel that when the chief executive officer of the state becomes so lost to the proprieties of position and a proper sense of decorum that he presumes in his official capacity and in a public manner to malign and contemn one of the courts of last resort of the state, because its decision did not conform to his views, it becomes necessary for the good name of the state within and without its borders and in order to preserve the respect and confidence of the people unimpaired, and its own proper self-respect, that the court should vindicate itself by properly condemning such an assault upon its integrity.

It is the duty of the courts to keep the judicial reputation of the state free from even the appearance of dishonor and to prevent the growth of that distrust in the minds of our own people that would certainly follow such a reflection upon their integrity if permitted to go unrebuked. The loss of public confidence in the integrity of the courts would be a calamity little

less than the loss of judicial integrity itself. The pomp and circumstance which in other countries aid to clothe the courts and the law with dignity and power are not in consonance with our republican form of government. In this country the power of the judiciary rests upon the faith of the people in its integrity and intelligence. Take away this faith and the moral influence of the courts is gone and popular respect for law impaired. When confidence in the courts is gone, respect for the law itself will speedily disappear, and society will become the prey of fraud, violence, and crime. Says an able jurist:

"The one element in government and society which the American people desire above all things else to keep free from the taint of suspicion is the administration of justice in the courts. So long as this is kept pure, a community may undergo extreme misgovernment and still prosper. But when these tribunals have become corrupt, and public confidence in them is destroyed, the last calamity has come upon a people, and the object of its social organization has failed. The protection of life, liberty, and property is the final aim of all government. This is accomplished by an honest administration of just laws. The people, by their respresentatives, may be relied upon to pass such laws, but, unless they are honestly administered, neither life, liberty, nor property enjoys the security which it is the object or government and society to give."

In the words of the immortal Marshall:

"The greatest scourge an angry heaven ever inflicted upon an ungrateful and a sinning people was an ignorant, corrupt, or a dependent judiciary."

Let us fervently hope no such curse may ever be drawn down upon the people of Oklahoma.

This court, independent of authority granted by the Constitution and laws, has the inherent power to punish for contempt of court, and it is its duty to employ with becoming firmness and dignity this power to protect itself and the reputation of the state against any unfounded and scandalous accusation made against it which has a tendency to prejudice the public or to embarrass and obstruct or prevent the due administration of public justice.

It may be that the Governor cannot be made to answer at the bar for a contempt of court, but the power to punish for contempt necessarily carries with it the right to repel, rebuke, and reprimand. The Governor's control over the judicial branch of the government is no greater than that of the humblest private citizen. The verdicts of juries and the judgments of the courts are not subject to revision by him, except that he has the power to grant after conviction, reprieves, commutations, paroles, and pardons. In the exercise of this power he has arrogated to himself the right to nullify the law prescribing the death penalty for murder at the discretion of the jury, and he has often stated in published interviews and in speeches to public assemblies that he would not permit the law prescribing the death penalty for murder to be carried into execution during his term of office, and in accordance therewith, upon the sole ground that he is opposed to capital punishment, he has uniformly commuted death sentences. In the Prather case, he, as by law provided, requested the opinion of the judges and the same was given (see *Opinion of the Judges,* 6 Okla. Cr. 18, 115 Pac. 1028); he commuted the sentence and in a published interview announced that he did not think that the opinion stated the law. In the case of Cotton, from Wagoner county, who without a pretense of justification killed an officer of the law, and who upon his trial was sentenced to be hanged, the Governor, without waiting to receive the transcript of the evidence required by law to be furnished by the trial court to him, or to permit this court to pass upon the legality of the sentence, commuted it. It is unnecessary to theorize or comment upon the deplorable results. The facts are only too well known. He has also invoked the military arm of the state government to obstruct the execution of process issued upon a mandate of the Supreme Court. See the case of *Fluke et al. v. Canton,* 31 Okla. 718, 123 Pac. 1049. And his first message to the Fourth Legislature contained an unwarranted diatribe against this court. Therefore it is not strange that he assumes authority to publicly censure and criticise the courts when their decisions do not meet his views, even though it tends to destroy confidence in and excite odium against the courts and the law.

The theory of monarchial forms of government is that the reigning sovereign rules by "divine right," and that he is the depository of all supreme power, that whatever of liberty the people possess or enjoy is a gracious grant on the part of the sovereign, and the power to pardon is a dispensing power of the sovereign. A crime in such a country is not against the government, but against the King. With us the theory of government is different. If a man commits a crime in this state, he is prosecuted for having offended not against the executive, the legislative, or judicial branches of the government, but for having offended "against the peace and dignity of the state." This is a government of laws, and not of men; and the doctrine of divine right and passive obedience is as foreign to our institutions as the principle that the King can do no wrong.

How well the members of this court have honored their high trust, and how well they have administered the law in behalf of the life and liberty of the citizen, is a matter for the people to determine, but on behalf of my Associates and myself I can say that we have the consolation of knowing that we have endeavored to honor our judicial trust by a faithful regard to our official oaths and the Constitution and laws of Oklahoma.