**FITZPATRICK v. McALISTER, Sec. of State Election Board, et al.**

No. 17513—Opinion Filed June 28, 1926.

(Syllabus.)

1. **States—Officers — Constitutional Inhibition Against Governor and Others Succeeding Themselves.**

Article 6 of the Constitution defines the executive department of the state and names certain officers who shall be vested with executive powers.

Section 2 of said article is as follows:

"The supreme executive power of the state shall be vested in a Chief Magistrate, who shall be styled 'The Governor of Oklahoma'."

Section 4 of said article contains the following provision, to wit:

"The Governor, Secretary of State, State Auditor, and State Treasurer shall not be eligible immediately to succeed themselves."

2. **Same—Lieutenant Governor—Exercise of Executive Authority During Temporary Absence of Governor — Constitutional Provisions.**

Sections 15 and 16 are in pari materia to the extent that they relate to and form part of the entire purpose and scheme provided for in article 6, and to such extent only. They are independent of each other to the extent that they deal with and provide for the distinctly different conditions which each does provide for.

Said section 15 provides for such vacancies only as may be caused by the elected Governor's temporary absence from his office, and where, though absent from his office, he still retains his right to the office, still possesses his right, upon his return, to assume the duties and exercise the powers of his office, and further provides that during such vacancy, if the Lieutenant Governor becomes incapable of performing the duties of the office, then the President of the Senate may act as Governor, and in case of his disability the Speaker of the House may act as Governor, during such vacancy, thus making complete and adequate provisions for taking care of the peculiar contingency and condition which it seeks to provide for, viz., vacancies occasioned by a temporary absence or inability of the Governor, where the Governor still has the right to return to his office and assume its duties, and to this extent section 15 is independent of section 16.

3. **Same — Succession to Governorship for Remainder of Term.**

Section 16, art. 6, Const., is as follows:

"In case of impeachment of the Governor, or of his death, failure to qualify, resignation, removal from the state, or inability to discharge the powers and duties of the office, the said office, with its compensation, shall devolve upon the Lieutenant Governor for the residue of the term or until the disability shall be removed."

Thus section 16 makes provision for a wholly different contingency and condition from that provided for in section 15. Section 16 provides for occasions where the individual rights of the elected Governor, as distinguished from the public rights, have been terminated, where his rights to return to the office and assume its powers have been foreclosed, and in order to protect the right of the public to continuation of the functions of government, in such cases, section 16 provides that the office of Governor, with its compensation, shall devolve upon the Lieutenant Governor for the residue of the term, thus making complete and adequate provision for the particular contingency and condition which it seeks to provide for, and to this extent section 16 is independent of section 15.

**4. Same—Uninterrupted Functioning of Executive Office.**

Section 16, art. 6, Const., creates no vacancy, contemplates no vacancy, mentions no vavancy; it simply makes provision for an uninterrupted functioning of the office of Chief Executive with a duly commissioned officer at the head of such department, thereby avoiding a vacancy.

**5. Same—Impeachment of Governor—Automatic Succession to Office—Ineligibility of Successor to Succeed Himself as Governor.**

When the elected Governor becomes impeached, as is the condition presented here, the office of Governor automatically devolves upon another; the person on whom such office devolves necessarily fills such office, exercising all the powers, discharging all the duties and enjoying all the emoluments, compensation, honor, and prestige which pertain to such office. The person who thus fills the office of Chief Magistrate is styled "The Governor of Oklahoma"; he is the Governor, for the simple reason that he governs; he governs officially for the reason that section 16 expressly vests him with authority to do so; therefore he is the official Governor, and being the official Governor, he is rendered ineligible to succeed himself by the inhibition contained in section 4, art. 6, of the Constitution.

Error from District Court, Oklahoma County; William H. Zwick, Judge.

Injunction by Kirby Fitzpatrick against W. C. McAlister, Secretary of State Election Board, and others. Judgment for defendants, and plaintiff brings error. Reversed.

Roger L. Stephens. Fred L. Hoyt, and Reuben M. Roddie, for plaintiff in error.

Geo. F. Short, Atty. Gen., and J. Berry King, Asst. Atty. Gen., for defendants in error State Election Board and State Board of Public Affairs.

C. B. Stuart, J. D. Lydick, Jos. C. Stone, N. A. Gibson, Frank Dale, John Barry, and J. H. Gordon, for defendant in error M. E. Trapp.

HARRISON, J. This proceeding was begun in the district court to test the eligibility of Mr. M. E. Trapp to succeed himself in the office of Governor.

Mr. Trapp had theretofore filed his application with the State Election Board as a candidate for nomination for Governor, and plaintiff sought to enjoin said board from certifying Mr. Trapp's name to the State Board of Affairs, and to enjoin the State Board of Affairs from having Mr. Trapp's name printed as a candidate for Governor on the official ballots to be voted at the forthcoming primary election to be held in August of this year.

The trial court denied the injunction, and plaintiff appealed. Plaintiff contends that under the provisions of article 6 of the Constitution, Mr. Trapp is not eligible to the office of Governor. Defendants contend that he is eligible. The controversy arose out of the following facts, viz.:

At the November election, 1922, J. C. Walton was elected Governor, and defendant M. E. Trapp, was elected Lieutenant Governor, and both went into office in January, 1923. In November, 1923, Mr. Walton was impeached and removed from office by the Senate sitting as a court of impeachment, and thereupon by virtue of section 16, art. 6, of the Constitution, the office of Governor devolved upon the Lieutenant Governor, who was defendant M. E. Trapp, who has occupied the office of Governor and exercised the powers of Governor from the date of said impeachment until the present date, and is now occupying such office with the powers thus conferred by said section 16, and is seeking the nomination for Governor and to ultimately succeed himself to the office of Governor at the general election in November of this year.

Plaintiff in error contends that under section 16, art. 6, of the Constitution, the office of Governor devolved upon the Lieutenant Governor immediately upon the impeachment of Governor Walton, and that thereupon Lieutenant Governor Trapp became the Governor in fact and in law, and that having held and filled the office of Governor and exercised the powers of Governor and enjoyed the emoluments of the office of Governor from the time said office devolved upon him until the present time, he is not now eligible to succeed himself to the office of Governor at the ensuing term because of the inhibition contained in section 4, art. 6, of the Constitution, which is as follows:

"The Governor, Secretary of State. State Auditor, and State Treasurer shall not be eligible immediately to succeed themselves."

On the other hand, it is contended by defendants in error that upon the impeachment of Mr. Walton there became a vacancy in the office of Governor, which has never been filled, but which has existed to the present time, and now exists, and that though the powers, duties, and emoluments of the office of Governor devolved upon Lieutenant Governor Trapp upon the impeachment of Governor Walton, yet Mr. Trapp did not thereby become Governor in every sense of the word, but became merely

acting Governor, during a vacancy, and that not being Governor, but being merely "Acting Governor," he is therefore not rendered ineligible by the inhibition conta_ned in said section 4, art. 6.

Defendants in error further contend that by harmonizing the provisions of sections 15 and 16 of said art. 6, and construing the two sections together, it will be seen that no vacancy was caused in the office of Lieutenant Governor by the devolution of the office of Governor upon the Lieutenant Governor, and no vacancy now exists in the office of Lieutenant Governor, and that therefore Mr. Trapp is still Lieutenant Governor, but that a vacancy does exist in the office of Governor by reason of Governor Walton's impeachment and removal from office, and that Mr. Trapp's being merely "Acting Governor" during such vacancy does not fill such vacancy, and therefore the inhibition in said section 4. art. 6, does not apply to him; that said inhibition applies only to an "elected Governor," and does not apply to one upon whom the "office of Governor" has been devolved by virtue of said section 16.

From the foregoing may be seen the respective positions of the parties to this controversy, and that the main question to be determined is whether, under the existing conditions, the inhibitive provision in said section 4 applies to Mr. Trapp.

The questions involved have all been briefed and orally argued by the parties hereto, and in addition to the briefs and oral arguments of parties in the instant case, case No. 17520. J. B. A. Robertson v. State Election Board and M. E. Trapp, 121 Okla. 99, 248 Pac. 583, which involves the identical questions herein presented and seeks the very same relief herein sought has also been briefed and was orally argued and submitted with this case, the briefs in both cases to be used in each.

It is notable that while numerous authorities have been cited in support of the contentions of the parties, yet no case has been cited where the identical conditions here presented and the identical questions of law here involved have ever been passed upon and decided by any court of last resort.

We have been unable to find any case ourselves that is at all similar in all its phases.

Though plaintiff in error is represented by able and diligent counsel, and defendants in error represented by a remarkable array of powerful lawyers, yet no case directly in point has been cited: that is, no case where

any candidate has ever aspired to any office in the face of a similar constitutional inhibition against his immediately succeeding himself in office.

Hence, in the absence of a controlling decision, it becomes necessary to search the provisions of our Constitution for a solution of the problem presented, guided in so doing by such light as the partially analogous cases cited may afford us.

Article 4 of our Constitution distributes the powers of state government into three separate departments, viz.: Legislative, executive, and judicial.

Article 6 defines the executive department and names certain state officers who shall be vested with executive power. The provisions of said article 6 pertinent to the questions under consideration are:

Section 1, which says:

"The executive authority of the state shall be vested in a Governor, Lieutenant Governor, Secretary of State, State Auditor, Attorney General, State Treasurer, Superintendent of Public Instruction, State Examiner and Inspector, Chief Mine Inspector, Commissioner of Labor, Commissioner of Charities and Corrections, Commissioner of Insurance. and other officers provided by law and this Constitution, each of whom shall keep his office and public records, books, and papers at the seat of government, and shall perform such duties as may be designated in this Constitution or prescribed by law."

Section 2, which says:

"The supreme executive power shall be vested in a Chief Magistrate, who shall be styled "The Governor of the State of Oklahoma."

Section 4. which, after prescribing the length of term of office of certain state officers, including the Governor, says:

"The Governor, Secretary of State. State Auditor, and State Treasurer shall not be eligible immediately to succeed themselves."

Section 15, which says:

"The Lieutenant Governor shall possess the same qualifications of eligibility for office as the Governor. He shall be President of the Senate, but shall have only a casting vote therein, and also in joint vote of both houses. If, during a vacancy of the office of Governor, the Lieutenant Governor shall be impeached, displaced, resign, die or be absent from the state, or become incapable of performing the duties of the office. the President, pro tempore, of the Senate, shall act as Governor until the vacancy be filled or the disability shall cease; and if the President. pro tempore, of the Senate. for any of the above enumerated causes. shall become incapable of performing the duties

pertaining to the office of Governor, the Speaker of the House of Representatives shall act as Governor until the vacancy be filled or the disability shall cease. Further provisions for succession to the office of Governor shall be prescribed by law."

Section 16, which says:

"In case of impeachment of the Governor, or of his death, failure to qualify, resignation, removal from the state, or inability to discharge the powers and duties of the office, the said office, with its compensation, shall devolve upon the Lieutenant Governor for the residue of the term or until the disability shall be removed."

These are the sections of said article 6 which bear directly upon the question before us, viz.: Whether the defendant M. E. Trapp is eligible to succeed himself in the office of Governor. It is observed that in section 1, art. 6, supra, the Lieutenant Governor is named as one of the executive officers of the state and is vested with executive authority. He is expressly made a part of the Executive Department. As to what his executive powers are, and when and how he may exercise them, will be seen in the further course of our analysis.

By section 2, supra, it will be seen that the supreme executive power is in reality vested in a Chief Magistrate, who shall be styled "The Governor of Oklahoma."

The real executive head, therefore, the office in whom the supreme executive power of the state is in intendment and in reality vested, is a Chief Magistrate. It is in the office of Chief Magistrate that the supreme executive power is lodged; the person who exercises the supreme executive power of the state does so by virtue of his being the Chief Magistrate.

The person on whom such office by the Constitution devolves, necessarily fills such office and exercises all powers lodged in such office, and is charged with all the duties pertaining to such office and enjoys all the emoluments, compensations, honor, and prestige which belong to such office. The person who thus fills the office of Chief Magistrate is styled "The Governor of Oklahoma." He is the "Governor" for the simple reason that he governs; a Governor is one who governs. He governs officially for the reason that section 16 vests him with authority to do so and requires him to do; therefore he is the official Governor. The provision of section 4, supra, speaks for itself; it simply says in simple words, "The Governor * * *shall not be eligible immediately to succeed himself."

Section 15, supra, prescribes that the Lieutenant Governor shall possess the same qualifications of eligibility for office as the Governor. It also imposes other than executive duties upon the Lieutenant Governor, viz.: He shall be President of the Senate, and shall have a casting vote therein and a casting vote also in joint session of both houses. These duties are not imposed upon him nor these powers conferred upon him because he is one of the executive officers of the state, for they are not executive duties; they are legislative duties. The Constitution does not say why these duties are imposed upon the Lieutenant Governor. It may have prescribed such duties for him because as a rule in states of the Union similar duties and powers are generally given to the Lieutenant Governor, and because, under the federal Constitution, the Vice President performs similar duties, such being the general custom and general conception of the proper and harmonious method of running the entire machinery of our government. But whatever may have been the reason for giving these powers and duties to the Lieutenant Governor, it is a fact that they are given him by our Constitution.

Said section 15 further provides that if, during a vacancy of the office of Governor, the Lieutenant Governor shall be impeached, * * *or become incapable of performing the duties of the office, the President pro tempore of the Senate shall act as Governor, until the vacancy be filled, and if the President of the Senate, for any reason, becomes incapable of performing the duties pertaining to the office of Governor, then the Speaker of the House shall act as Governor, until the disability ceases. Now let it be observed that the words, "shall act as Governor," are not applied to the Lieutenant Governor, but are applied only to the President of the Senate and Speaker of the House, in cases where the Lieutenant Governor is under a disability. The words, "shall act as Governor," or, as defendants in error put it, "the acting Governor," are not anywhere in the Constitution applied to the Lieutenant Governor. They are applied nowhere else, nor to any one else, except to the President of the Senate and Speaker of the House, and to them only in cases where "the Lieutenant Governor becomes incapable of performing the duties of the office." This section nowhere denominates the Lieutenant Governor as a mere "acting Governor," nor does it imply that he is regarded as only "an acting Governor." It says, "or become incapable of performing the duties of the office," meaning the office of Governor. Then,

in such case, the President of the Senate shall act as Governor, and if he be disqualified. then the Speaker of the House shall act as Governor. The Lieutenant Governor is nowhere spoken of as "acting Governor."

But section 16, supra, provides that, in case of impeachment of the Governor, the said office, with its compensation, shall devolve upon the Lieutenant Governor. This section does not say, "upon the Lieutenant Governor, who shall act as Governor," but it says, "the said office, with its compensation, shall devolve upon the Lieutenant Governor for the residue of the term or until the disability shall be removed." It means that all the powers, duties, and responsibilities of the office of Governor shall devolve upon the Lieutenant Governor, and that all the emoluments, compensation, honor, dignity, and prestige of the said office shall be his. He is thereby made the Chief Magistrate in fact by the plain language of the Constitution. He is vested with all the powers, and charged with all the duties and responsibilities, and is given all compensations which belong to the Chief Magistrate. in whom the supreme executive power of the state is vested. "The said office, with its compensation, shall devolve upon the Lieutenant Governor."

But it is insisted by defendants in error, persistently and repeatedly, that the two sections, 15 and 16, must be construed together, and that by construing them together we. find a vacancy in the office of Governor, a vacancy which, they claim, we are not at liberty to read out of the Constitution. a vacancy which is not filled by the Lieutenant Governor, as he is a mere "acting Governor." a vacancy which the law makes no provision for filling except by an election. But, upon examination of the two sections, we find that by either construing the two sections together or by construing them separately, we nowhere find the Lieutenant Governor referred to as "acting Governor." Furthermore, we nowhere find the words "shall act as Governor." except in cases where the Lieutenant Governor is. for some reason, rendered incapable of performing the duties of Governor, then the President of the Senate or Speaker of the House shall "act as Governor."

Under section 16, when the Governor is impeached, and his rights become foreclosed. the office devolves upon the Lieutenant Governor.

The word "devolve" is defined by lexicographers and in law dictionaries as meaning to roll or tumble down or descend; to be transmitted by course of events, or by operation of law; to transfer from one person to another; to pass by transmission to another; to pass from a person dying to a person living; to pass from the possessor to a successor. See Webster's Int. Dict. 1923; Funk & Wagnall's Stand. Dic.; Black's Law Dict.; 14 Cyc. 286; Words & Phrases, both First and Second Series; 18 C. J. p. 1034, and notes.

Hence, when Governor Walton became impeached, when the judgment of the high court of impeachment was pronounced. the official powers of Mr. Walton ended, his rights of tenure were ended, and the office of Chief Magistrate of the state, the office in which is lodged the supreme executive powers of the state, automatically, instantaneously with the ending, descended upon, passed down to, devolved upon, Mr. Trapp. There was no interim, no vacancy, no delay in the transmission, no interruption in, no suspension of the functions of government; they passed right on. By the judgment of impeachment, Mr. Walton's authority ceased, his term and tenure ended, his individual rights were foreclosed, "the said office, with its compensation," devolved automatically upon Mr. Trapp; there was no vacancy created, none intended, none contemplated. It was never intended that under the conditions provided for in section 16, there should be an interim during which the state would have no Governor, and the functions of government be suspended, but on the contrary it is· wisely provided in said section 16 that, when by operation of law or by reason of other circumstances the authority of the elected Governor is terminated, his tenure ended and his individual rights foreclosed, the said office (the Governor's office). with its compensation, shall devolve upon another, in order that the functions of government may continue without interruption and the public rights be protected.

Section 16 deals with conditions wholly different and distinct in their very nature from the conditions dealt with in section 15, and to this extent the two sections are independent of each other.

It is contended by defendants in error that the two sections must be construed together to give effect to either, and the case of Ex. parte Crump, 10 Okla. Cr. 133, 135 Pac. 428, in which Judge Doyle, who delivered the opinion of the Criminal Court of Appeals. held that the two sections, 15 and 16, art. 6, are in pari materia. We concur with the learned judge in the view that said sections 15 and 16 are in pari

materia to the extent that they relate to and form a part of the entire purpose of article 6, to the extent that they aid in providing for and constitute an element of the entire scheme intended to be provided for in article 6, but to such extent only. They are independent of each other to the extent that they deal with and completely provide for the distinctly different conditions which each does provide for.

Section 15 anticipates vacancies, such as may be caused by the Governor's absence from the state, and other circumstances which may cause a temporary absence of the Governor from his office, and refers to such occasions as vacancies, but these are occasions where, though the Governor may be absent from his office, though he may be sick or out of the state and temporarily away from his office, yet he still retains his right to the office. His right to the office has not been terminated, his term nor tenure has not been ended, by operation of law, by judicial proceedings, or by other circumstances; he still has, still possesses, his right to the office, and upon his return may assume the duties and exercise the powers of his office. Such instances the Constitution treats as vacancies, and provides for the filling 'of such vacancies, and that when either the President of the Senate or Speaker of the House fills such vacancies, he merely acts as Governor during such vacancy.

But section 16 deals with a wholly different and distinct condition, a condition which was deemed essential to be separately dealt with and one which 'past history 'has shown to have been necessary to be dealt with, viz., a condition where the Chief Magistrate, the one who is styled "the Governor of Oklahoma," has been impeached and removed from office, where his rights have been foreclosed and his term and tenure ended. In such case there is no vacancy, therefore no need to speak of a vacancy; the office immediately devolves upon the Lieutenant Governor, hence section 16 does not speak of a vacancy.

It is unnecessary to draw a distinction between a "temporary vacancy" and a "permanent vacancy." It is unnecessary to say whether there is a distinction between the two terms. Section 15 unquestionably has reference to temporary vacancies and to temporary vacancies only, and deals with and provides for temporary vacancies only. Nowhere does article 6 speak of a permanent vacancy. Section 16, in dealing with the conditions which it provides for, does not recognize a vacancy of any kind, but provides

that the powers of government may continue right on, that the ship of state, as it were, may continue its course without interruption and with a duly commissioned Chief Executive at the helm.

Defendants in error say:

"Section 15 is the sole and only section of the Constitution which authorizes any one to exercise and perform the powers and duties of the office of Governor other than the elected Governor himself."

This contention has no support from the Constitution. If it were true, then the Lieutenant Governor has no authority under any circumstances to exercise the powers and discharge the duties of Governor and draw a Governor's pay. For it must be clearly seen that section 15 does not in express words give to the Lieutenant Governor any such powers and privileges, but does expressly say that in certain cases the President of the Senate, or in case of his disability, the Speaker of the House, may act as Governor, but it nowhere expressly says that the Lieutenant Governor, under any circumstances, may act as Governor. Hence, if section 15 is the only section which authorizes the Lieutenant Governor to act as Governor, and it be true, as defendants contend, that he has no authority except such as is expressly given him, then he has no authority, under any circumstances, to exercise the powers of Governor, for it is only by implication that section 15 authorizes him to exercise such powers. The following language in said section 15, to wit:

"If, during a vacancy of the office of Governor, the Lieutenant Governor shall be impeached, * * * or become incapable of performing the duties of the office, the President, pro tempore, of the Senate shall act as Governor; * * * and if the President, pro tempore, of the Senate,* * * shall become incapable of performing the duties pertaining to the office of Governor, the Speaker of the House of Representatives shall act as Governor until the vacancy be filled. * * *"
—is the only language in section 15 which even implies that the Lieutenant Governor shall ever, at any time, exercise the powers of Governor or even "act as Governor." However, the above language does imply that, in case of a temporary absence of the Governor, that is, such a temporary absence as renders him incapable of discharging his duties, then the Lieutenant Governor may exercise a Governor's powers and perform a Governor's duties, unless, for some of the reasons mentioned, he is rendered incapable of doing so, but it is by implication only that he derives such authority from section 15.

But, as heretofore pointed out, section 16 expressly says:

"In case of impeachment of the Governor * * * or inability to discharge the powers and duties of the office. the said office, with its compensation, shall devolve upon the Lieutenant Governor."

As to the contention of defendants in error that the inhibition in section 4, supra, applies to an elected Governor only, and does not apply to one on whom the office of Governor devolves, we must answer that the Constitution says no such thing. The Constitution says the Governor shall not be eligible immediately to succeed himself. This inhibition is not confined to an elected Governor, at least, by any express language, nor is it confined to any particular length of term, nor is its application restricted to a four-year term; it simply says the Governor shall not be eligible immediately to succeed himself. In its literal sense, and its every practical working sense, a Governor is one who governs, and conversely, one who governs is Governor. The language of section 4, in its literal significance, applies to the one who is governing at the time the circumstances arise for an election to succeed himself, and does not except any one from the force of the ineligibility clause merely because he may have been governing for a short period only.

Defendants in error contend that it should apply only to an elected Governor who has served a four-year term, and that it should not apply to a portion of a four-year term: that if the elected Governor should be impeached one week or one day before the time for filing as a candidate to succeed himself, that under such circumstances it would be absurd to apply the provision of said section 4.

As to whether these suggested conditions may ever become possibilities, we are not called upon to decide; the present case does not present such a condition, and it would be mere dictum for us to say what should be done under such remote possibilities. It might suffice to say, however, that if such conditions should arise, the courts will cross that bridge when it is reached.

Defendants in error argue also that the plaintiff's contention would bring about a condition wherein the elected Governor, if he saw fit to do so, in order to prevent the Lieutenant Governor from running for Governor. might resign or be removed or impeached. a week or a day before the time for announcing as a candidate and thereby force the Lieutenant Governor to act as Gov-

ernor during the remaining week or day of the term, and then, by applying section 4. prevent the Lieutenant Governor from running for office. This is another bridge which the courts will cross when it is reached. In this connection, however, it is perceived that such remote possibilities might as easily come from the opposite direction. For example, an elected Governor might fail to qualify; he might die on the day before his time for taking office; in such case the office of Governor would devolve upon the Lieutenant Governor, for four years, and he might serve until the time arrived for filing as a candidate and resign, and thereby make it the duty of the President of the Senate or Speaker of the House to act as Governor, with an understanding with the President of the Senate or Speaker of the House that no change would be made in governmental policies nor in the numerous appointive boards and employes, and again announce and run for Lieutenant Governor, with an understanding with some person running for Governor, that if elected he would not qualify, but would leave the powers and duties of the office of Governor to devolve upon the Lieutenant Governor, who if he should be elected as Lieutenant Governor, would then have another four-year term in the office of Governor, and the same proceeding might possibly be repeated for a number of terms, at the end of which terms he could run for Governor himself, claiming that he had been only "acting Governor," thus perpetuating himself in the office of Governor, the very condition which section 4 expressly prohibits.

So, while it is seen that these theoretic possibilities may work both ways, yet none of such conditions are before us now, and that bridge will be crossed when it is reached.

We now have before us an actual and clearly defined problem with the provisions of the Constitution as our only rule for solution. The authorities cited afford us very little light; none of them deal with conditions anything like similar to the conditions here presented. and none of them have construed constitutional provisions identical with ours.

It is unnecessary to give space to the constitutional provisions of other states, nor to a discussion of the effect which such provisions have in other states, nor is it proper for us to interpret the decisions from other states to the extent of saying what effect they have on such states, but we may properly say what application the decisions of

another state have to the law of our state, and may properly say what degree of persuasiveness they have upon us in construing the laws of our state, and as no decisions have been cited exactly in point, and no constitutional provisions construed identical with ours, we are forced to construe our own Constitution with the effect it has upon our state in view.

Again referring to the Crump Case, supra, and to the case of People v. Wells, 2 Cal. 198, which is quoted from with apparent approval by the Criminal Court of Appeals in the Crump Case, and which is separately cited by defendants, we find that neither of those decisions deals with a condition at all similar to the one here presented. In the Crump Case the court was dealing with an occasion of temporary absence of the Governor from the state; the question being whether during such temporary absence the Lieutenant Governor had authority to issue pardons. The court was dealing with an absence, a vacancy, which was essentially temporary; the facts in the case and the reasoning of the court show that it was essentially temporary and that the court had such a condition in view, looked at it from that standpoint of a temporary vacancy in reaching its final conclusion. In that case, the absence of the Governor was only a temporary absence and the vacancy created in his office was only a temporary vacancy: the Governor, though temporarily absent, still had the constitutional right, upon his return, to assume the duties of the office of Governor, but, under the conditions here presented, the impeached Governor has no right to return and oust the present Governor and assume the powers of the office of Governor. Mr. Walton's rights to the office, his tenure of office, his term of office, which, as the California case says, belonged to him as an individual, have been terminated and foreclosed by the court of impeachment, but, as was also held in the California case, the people's right to a continuous functioning of the government has not ceased. These are the conditions which we have here, and section 16 provides for just such conditions. Hence, neither the Crump Case nor the California case is controlling in this case further than heretofore indicated.

Defendants lay stress upon the concluding words of section 16, to wit: "Or until the disability shall be removed." We are dealing with a condition where the disability cannot be removed; the law provides no means for its removal; it has become final, and it is our duty to avoid speculations

and deal with the actual condition which confronts us.

Plaintiff in error cites three Oregon cases, viz., Chadwick v. Earhart (Ore.) 4 Pac. 1180; Olcott, Gov., v. Hoff, Treas. (Ore.) 181 Pac. 466; State ex rel. Boberts v. Olcott (Ore.) 187 Pac. 286, in support of his contentions.

We do not feel at liberty to say what effect the decisions of the court of Oregon have upon the state of Oregon, but it is obvious to us that the conclusions were reached from a different standpoint than the standpoint here presented. The first Oregon case was dealing with the mere sordid question of salary; the question being whether the Secretary of State, under certain conditions, was entitled to the Governor's salary; and in the second case also the question of salary appears to have been the bone of contention. In the third case, the court followed the previous holding, under the doctrine of stare decisis. However, it was held in the Oregon cases that the person on whom the office of Governor devolves becomes Governor.

The case of Futrell v. Oldham, 107 Ark. 386, 155 S. W. 502, is cited by defendants in error, but that case is not in point here. In the opinion the court said:

"The case turns on the question whether, on the resignation of the Governor, the then incumbent of the office of President of the Senate succeeded to the vacated office, or whether merely as such President of the Senate, the powers, duties, and emoluments of the office. * * * devolved upon him while he remained President."

This case is not in point here, because it deals with a different condition, and for the further reason that the President of the Senate is not made an executive officer, nor constituted a part of the Executive Department by the Constitution of Arkansas, as is the Lieutenant Governor constituted by the Oklahoma Constitution. Plaintiff in error also cites section 1, art. 2, of the Constitution of the United States, and the instances, six separate occasions, where, upon the death of the President, the Vice President has succeeded to the office of President and became President of the United States, and has been so recognized. Said section of the federal Constitution is identical with ours, with the exception that ours is the stronger and more definite, as may be seen from the following parallel:

| "Sec. 16, art. 6, Constitution of Oklahoma. | "Sec. 1, art. 2, Constitution of the United States of America. |

"In case of impeachment of Governor, or of his death, failure to qualify, resignation, removal from the state, or inability to discharge the powers and duties of the office, the said office with its compensation shall devolve upon the Lieutenant Governor for the residue of the term or until the disability shall be removed."

"In the case of removal of the President from office, or of his death, resignation, or inability to discharge the powers and duties of the said office, the same shall devolve on the vice-president."

It will be seen that the only difference between the two Constitutions. both dealing with the same conditions, is that the federal Constitution says, "the **same** shall devolve on the Vice President," while the Oklahoma Constitution says, "the **said office,** with its compensation, shall devolve upon the Lieutenant Governor." Defendants in error argue that no court has ever decided that the Vice President became President upon the death of the President, and appear to discount the departmental construction which the various departments of the federal government, including the federal Congress, have placed upon the above provisions of the federal Constitution. This construction has stood since April 4, 1841, when. upon the death of President Wm. H. Harrison, Vice President Tyler became President of the United States. For almost a century this construction of the federal Constitution has stood without question. It has been recognized as correct and acquiesced in, not only by the departments of State and all the states of the Union, but officially recognized by every civilized government of the world.

On each occasion where the President of the United States has died, the Vice President has immediately succeeded to the office of President, as President of the United States, and thereupon the government of the United States has at once, through its consular offices, notified all governments of the world of the change in Presidents.

Defendants suggest that o court has ever pronounced that to be the law. To our mind, it is so clearly correct that no one has ever presumed to test its correctness in the courts. Therefore it should have greater weight than an ordinary departmental construction, not only because it has stood for almost a century, but because it has been recognized as the correct conception of our system of government, and because for 85

years, under this construction, there has been no friction in the machinery of government by reason of such construction.

While this construction of the federal Constitution is entitled to weight, yet we are not confined to such construction as our sole guide in construing our own. The plain language of our Constitution, under the universally accepted meaning of the language used, is sufficient unto itself.

Defendants contend that every man has a right to run for Governor, and if elected, to become Governor once. This we concede, provided he possesses the constitutional qualifications for the office; but he must be 30 years of age, must have been a resident of the state three years, and must not be immediately succeeding himself in the office of Governor. Possessing these qualifications, he may become Governor as often as the people elect him, but lacking in either of them, his personal ambitions to become Governor are not to be weighed in the scales with the public interest and welfare.

The framers of the Constitution and the people in adopting the inhibition in section 4, supra, must have had reasons for so doing. The Constitution itself does not say what those reasons were, and we shall not assume to say what they were, but we may say what effect such provision has, and do say that it has a most wholesome and much needed effect. We judicially know that under the law the Governor of this state has very extensive powers; he is a member of and ex officio chairman of several of the most important and powerful boards and commissions of the state; he has authority to appoint and remove members of many important boards and commissions and to dictate the employment of every clerk, stenographer, helper and janitor allowed by law to be employed by such boards. We judicially know that he is ex officio chairman of the State Board of Equalization, which has power to equalize and fix property values and the rate of taxation; that he has power as Chief Executive to convoke the Legislature and to veto acts of the Legislature, to issue pardons to persons who have been duly convicted in the courts, and power to call out the militia, and many other far-reaching powers; and we also judicially know that under the law the present incumbent has all of the above-mentioned powers, and as a matter of common knowledge we know that too long an exercise of such tremendous powers by one man may bring about oppression and detriment to the public welfare, and that too long a ten-

ure of office, with the powers which a Governor has, may enable him to build up a dangerous and possibly invincible political machine with which to perpetuate his powers.

While we do not know and do not pretend to say whether the present incumbent or any other Governor has ever used his powers wrongfully or oppressively, yet we do know that section 4, whatever may have been the reason for its adoption, has the effect of preventing these possible dangers, and do know that it is well to guard against them.

Mr. Trapp is just as much a Governor, in every literal and practical sense and effect, as though he had been elected to the office; he has all the powers, emoluments, and immunities which could be conferred upon him by an election, as well as the same individual rights of tenure and occupancy which an elected Governor has, and except by impeachment for misconduct, there is no provision of law by which he can be divested of such rights until the end of his term. He is now filling the office, which, upon the impeachment of Mr. Walton, devolved upon him by section 16, and section 4 says "The Governor shall not be eligible immediately to succeed himself."

Discerning our system and plan of government and our constitutional provisions for the operation of same as we do, the reasons herein given become potent and conclusive.

The judgment of the trial court is therefore reversed, with directions to issue the order of injunction herein sought.

Reversed.

MASON, PHELPS, LESTER, HUNT, CLARK, and RILEY, JJ., concur. NICHOLSON, C. J., dissents. BRANSON, V. C. J., files dissenting opinion.

BRANSON, V. C. J. (dissenting). In this court the parties bear the same adversary positions as they bore in the district court. They are, therefore, referred to as plaintiff and defendants.

One Kirby Fitzpatrick, as plaintiff, sued the State Board of Public Affairs, the State Election Board, and the individual members of each. He prayed relief, enjoining the defendants from causing to be printed on the official Democratic primary ballots to be used throughout the state in the primary to be held, as required by law, the first Tuesday in August, 1926, the name of M. E. Trapp. The said M. E. Trapp had duly filed his application with the said defendant election board to be placed on such ballots as a candidate for nomination for Governor of Oklahoma, and his said application to be placed on said ballots had been by said board accepted.

The question of the propriety of the injunctive remedy sought is by none of the parties drawn in question, and the same will, therefore, not be discussed.

Only a part of the substance of the pleadings is necessary to be stated for a clear understanding of the issue.

At the regular November election, 1922, one J. C. Walton was duly elected as Governor of the state of Oklahoma; he was inaugurated by taking the constitutional oath on the 8th day of January, 1923, and thereafter continued to fill the office until the 23rd day of October, 1923, when the House of Representatives, duly assembled, filed im peachment charges with the State Senate, and the State Senate did, by resolution, on said last-named date, suspend him from office; but on the trial the charges were sustained and judgment entered removing him from office. (Sec. 168, C. O. S. 1921.)

At the same time the said Walton was elected Governor, the said M. E. Trapp was duly elected Lieutenant Governor of the state of Oklahoma for the constitutional term of four years, beginning on the 8th day of January, 1923, and on said date the said M. E. Trapp qualified as Lieutenant Governor by taking the constitutional oath of office, and, as defendants contend, has ever since been Lieutenant Governor by reason of his election to said office and his qualification as such officer.

An extended discussion of the one question presented is unnecessary to make lucid the conclusion we reach. The one question is, whether the said M. E. Trapp is eligible to be Governor for the term for which he seeks to be nominated and elected, and which term begins under the Constitution the second Monday in January, 1927. The plaintiff alleges that he is ineligible, and contends that because of his ineligibility he should not be placed on the primary ballots as aforesaid; while the defendants, taking the view that he is eligible, have accepted his filing and intend to place his name, unless prevented from doing so, upon such ballots.

Whether he is eligible depends upon the construction to be placed on certain provisions of the Constitution of the state. The correlation of these said provisions is before this court for the first time,

and we must say what they mean, for they are not without ambiguity. We have no exact precedent from the decisions of any other state to ease our task, for, while we find similar provisions in many Constitutions, we find none of them exactly as ours in their entirety. The decisions of other courts, hereinafter cited, are helpful so far as they deal with provisions similar to certain provisions here in question, but from the point at which they stop we must follow a rule of reason all our own.

It is admitted that the ineligibility attaches only to the Governor.

Before considering the particular provisions which bear directly on the dispute, consideration of the provisions of the Constitution as to who may be Governor and how he may become Governor we consider important. Bearing thereon we cite, but give only the substance of, the provisions, constitutional and statutory.

Article 6 (Williams' Oklahoma Constitution) creates the Executive Department of state government, names the officers in whom executive authority is lodged, and in a measure the conditions under which such authority is so lodged. Section 3 thereof makes any male person, who has been an elector of the state for three years and is not less than 30 years of age, eligible to be elected either Governor or Lieutenant Governor. Section 1 thereof provides, among other things:

"The executive authority of the state shall be vested in a Governor, Lieutenant Governor," etc.

It cannot be considered amiss to point out here that the express language of this section vests executive authority in the Lieutenant Governor of the state. Just when he can exercise the same and what authority he can exercise depends upon other provisions of the Constitution hereinafter discussed. Before going to them, however, we think it important to call the attention of the reader to the fact that article 3 (Williams' Oklahoma Constitution) provides for mandatory elections for state and other officers. The provisions of said article 3 of the Constitution as to mandatory elections were vitalized by statutory enactments passed by the first state Legislature of the state. This Legislature convened soon after statehood day, which was November 16, 1907, and the statute so vitalizing the said article 3 as to the mandatory selection of officers by popular elections is now brought down in our statutes as chapters 40 and 41, C. O. S. 1921. Section 6093, C. O. S. 1921, vitalizes that provision of article 3 of the Constitution which provides for a mandatory primary system; section 6126 provides for the election of persons so nominated at the primary the first Tuesday, after the first Monday of November of each even-numbered year, beginning in 1908.

Reverting again to the Constitution, we find that section 4 of said article 6 provides that the term of office of Governor and the term of office of the Lieutenant Governor (which run concurrently) shall be four years from the second Monday of January next after their election, and that it further provides that the **Governor shall not be eligible to immediately** succeed himself. We come to the question here at issue, Who is the individual made ineligible to immediately succeed himself? The language of the said section is that the **Governor is ineligible to immediately succeed himself**; the language of section 1 of the same article makes clear that executive authority is vested in both the Governor and the Lieutenant Governor. These sections contemplate that two individuals shall be elected at the same election for the same term of office, and that executive authority shall be vested in each. They are each required to have the same qualifications, but the latter is not cloaked with the same ineligibility as the former. Each is elected by the electors of the state. We think it is not subject to debate that there is no provision in the Constitution or statute whereby the Governor can be appointed by any individual or collection of individuals. There are ample provisions in the Constitution and statutes under which most of the other numerous officers of the state may fill their respective offices by appointment by the Governor, or other designated appointing power, for section 13 of article 6 provides that the Governor shall commission all officers who are not commissioned by law, and when any office shall become vacant **he shall,** unless otherwise provided by law, appoint a person to fill the vacancy until a successor shall have been elected. Under this provision it is not subject to debate that, if the Lieutenant Governor should die, be removed on impeachment, or remove from the state, or otherwise be taken from the office, the Governor is directed by the said section to appoint a Lieutenant Governor at least until the succeeding election. If the Governor should die, or be removed from office, there is nothing in the Constitution which authorizes the Lieutenant Governor to appoint a Governor.

We then ask ourselves the question, Can there be, under the Constitution of Okla-

homa, a constitutional Governor except as the electorate of the state makes one at an election? We find no provision in the Constitution which says so, nor do we find any which can be fairly so construed. Being the chief officer of the state, the ordinary meaning of the language used as to him expressly reserved to the people the sole power to make a Governor. Said section 1 of article 6 is different from other Constitutions dealing with the same matter. It vests executive power, not as a function to an office. whoever may be holder thereof, but in individuals, and so far as is involved here, in individuals referred to as Governor and Lieutenant Governor. Section 2 of article 6 makes a distinction between the executive power vested by section 1 in the Governor and the executive power vested in the Lieutenant Governor, in that it makes the executive power of the Governor supreme. Said section 2 says:

"The supreme executive power shall be vested in a Chief Magistrate, who shall be styled 'the Governor of the state of Oklahoma'."

But it cannot be said, with right reason, that because this section vests supreme executive power in a Chief Magistrate, styled "the Governor of the state of Oklahoma," it thereby robs the Lieutenant Governor of the executive power which the preceding section said should exist in the Lieutenant Governor. We ask ourselves the question, Under what circumstances could executive power be exercised by the Lieutenant Governor, and what power? Unless we desire to read something into said section 4 of article 6, or to read something out of the same, the conclusion is inevitable that a constitutional Governor is a person nominated at a primary and elected at a general election for a term of four years. Under said section 2 his right to use the executive power vested in him by section 1 is supreme. and when it exists at all it supersedes any executive power vested in the Lieutenant Governor, and such power so vested in the latter is dormant until some condition arises under which he can exercise the same. The Governor exercises supreme executive power from the day of his inauguration for a period of four years, subject to the conditions of sections 15 and 16 of article 6, which are in substance, to wit, his impeachment, failure to qualify, resignation, removal from the state, or inability to exercise the same, or vacancy in his office. When some one of these contingent conditions arises, it operates to strike down or suspend the Governor's executive power.

And, under such circumstances, shall we say that the executive power vested in the Lieutenant Governor cannot then be exercised by him? That part of section 1, in referring to the Lieutenant Governor, is meaningless unless the exercise of executive authority by the Lieutenant Governor was intended to be conditioned on the happening of some of the provisions enumerated in sections 15 and 16 of article 6. If some of said conditions exist, then under the said sections the performance of the duties of the supreme executive, whatever those may be made by law, are charged to the Lieutenant Governor, but the performance of these duties by him is not as Governor, for the Constitution does not say so, and he was not so elected. The Constitution does not say, when the Lieutenant Governor exercises executive authority so given him by section 1, he does so as Governor, but said section 1, when read in the light of the other sections of article 6, clearly recognizes that the elected Governor may be unable to exercise the same or to fill the office either because of impeachment, conviction on impeachment charges, death, failure to qualify, removal from the state, or some other inability, such as absence from the state, sickness. etc. The Constitutional Convention, knowing that some of the above disabilities might exist, or that the office might become vacant, and knowing that the same must be continuously filled in the sense that the duties of the office must be performed in the interest of the public good, in effect, says that if from any of these causes he, the Governor. is suffering from inability to discharge the duties of the office, the said office, with its compensation, shall devolve upon the Lieutenant Governor for the remainder of the term or until the disability shall be removed.

From the oral argument presented by counsel for plaintiff, the writer is unable to escape the conclusion that plaintiff's position is that we must turn the question here in dispute solely upon the language of the said section 16, and that part thereof which provides:

"That the said office, with its compensation, shall devolve upon the Lieutenant Governor for the residue of the term or until the disability shall be removed."

Diligent search can be made of each section of said article 6, creating and dealing with the Executive Department, and nothing therein can be found of an executive nature to be done by the Lieutenant Governor, except when a contingency arises as contemplated by sections 15 and 16. There

is nothing in any section of said article (and no other article) that either expressly or by fair intendment indicates that on the contingency of said sections arising, the Lieutenant Governor can exercise executive authority in any status other than as Lieutenant Governor. And can any reason be given why it should be exercised by him other than as Lieutenant Governor, when the only section vesting such authority in him says that it is vested in a Lieutenant Governor? The Governor being possessed of supreme executive authority until some contingency, as specified supra, arises, no executive authority can be exercised by the Lieutenant Governor, but when such contin gency does arise, he performs the duties of the office merely as the occupant of the office of Lieutenant Governor, to which he was elected.

Suppose we accept the contention of the plaintiff referred to in the foregoing para graph, to the effect that the question must be decided by the language:

"That the said office, with its compensation, shall devolve upon the Lieutenant Governor"

—and do not consider other sections dealing with the same matter (to do this, however, would violate all rules of constitutional and statutory construction), we then are faced with a definition of the word "office," as given in the latest authentic edition of Webster's New International Dictionary, as "a right to exercise a public function or employment and receive the emoluments thereto belonging." (Webster gives another— "in its fullest sense, office embraces the elements of tenure, duration, duties and emoluments.") Suppose we substitute the said definition of office in the sentence relied on by the plaintiff. It will then read, that the right to exercise the public functions (of the Governor—ours) and receive the emoluments thereto belonging, devolves upon the Lieutenant Governor. Would such sentence demote him as Lieutenant Governor and promote him as constitutional Governor? Would that strip him of his character as one official and make him another official? No such conclusion can be reached by any fair or logical process of reasoning, and there is no provision in the Constitution of the state whereby a person elected as one official may, by operation of law, take on the status of another official. If we even omit Webster's definition set out, supra, we find in sections 15 and 16 of article 6 that the terms "office" and "duties and powers of the office" are shown by the context to have been intended to mean that when the per-

son elected as Governor or Lieutenant Governor dies, or is otherwise incapacitated, it is only the duties and powers which he might have exercised that can be performed by another and distinct officer.

It must be noted that section 16 draws no distinction between his status in exercising executive authority by the Lieutenant Governor where there is a permanent disability, such as death or removal from office, and where there is merely a temporary disability on the part of the supreme executive. This was clearly pointed out in the case of Ex parte Hawkins, 10 Okla. Cr. 396, 136 Pac. 991, and in Ex parte Crump, 10 Okla. Cr. 133, 135 Pac. 428, in which the Criminal Court of Appeals of this state construed sections 15 and 16 of article 6, supra. In so construing them that court cited with approval the logical reasoning of the Supreme Court of California in the case of People v. Wells, 2 Cal. 198. There is no section of the Constitution, unless we read something into it, which undertakes to make the Lieutenant Governor a constitutional Governor merely because he may exercise powers that would be, but for some contingency as set out above, exercised by the supreme executive. But plaintiff argues vigorously that the Constitution never contemplated that a vacancy should ever exist in the office of Governor. The idea plaintiff expresses is only true in the sense that the Constitution never contemplated that there should not be someone within the state who could exercise executive authority ordinarily exercised by the Governor. But there is nothing to be found therein which indicates that it must always be exercised by the officer known as Governor. This is clear from section 15, which, among other things, says:

"If during a vacancy of the office of Governor, the Lieutenant Governor shall be impeached, displaced, resign, die, or be absent from state, or become incapable of performing the duties of the office, the President pro tempore, of the Senate, shall act as Governor until the vacancy be filled or the disability shall cease."

We think this section clearly shows that the makers of the Constitution contemplated that a vacancy might exist in the office of Governor, either temporary or permanent. When a permanent vacancy occurs, said section clearly directs that the Lieutenant Governor shall exercise the powers and duties of the office, and if during that time he, the Lieutenant Governor, should be impeached, displaced, resign, die, or be absent from the state, section 15 directs that the President pro tempore of the Senate shall per-

form the duties of the office, and also provides for additional succession to such duties. Should we give the said constitutional provisions the construction contended for by plaintiff, and say, as he desires, that when the Governor is removed from office the Lieutenant Governor becomes the constitutional Governor, it would be tantamount to saying that the Lieutenant Governor as such was not given any executive authority, under any contingency, by the language of section 1. Such would lead to confusion, and such confusion as we believe the adroit minds of those who framed the Constitution would have prevented had they anticipated this court would read into the Constitution a construction of its provisions that would make a Lieutenant Governor constitutional Governor though never elected as such. The inability of the Governor to **immediately succeed** himself is a limitation upon the right given to every citizen of the state to seek this high office, who possesses qualifications set out above. Unless clear from the language used, we must not give this restrictive provision a meaning that would so penalize a man who had been elected only as Lieutenant Governor, when, and if, while serving. he should be nominated and elected Governor, he would be disqualified to take the office when inauguration day arrived if the Governor had died or been removed between election day and inauguration day. Should we give it the construction plaintiff contends for, then the minute the Governor resigns, is removed on impeachment, or dies, the Lieutenant Governor instantly becomes the constitutional Governor by operation of law and the office of Lieutenant Governor thereby becomes vacant. If this is the law, under section 13 of said article 6, supra. he could immediately appoint a Lieutenant Governor, and if feeling friendly to the deposed Governor, he could forthwith hand such impeached and removed Governor a commission as the Lieutenant Governor of the state, and then if the friendship extended that far, out of personal consideration for the Governor so removed, could resign himself as Governor, whereupon the Governor so impeached could forthwith become the constitutional Governor by operation of law. Shall we read these provisions into article 6, which might bring about such conditions when otherwise they would not be possible? If on the removal of the Governor the Lieutenant Governor automatically is removed from the office to which he was elected, and instantly becomes Governor, in the exercise of his appointive power, under section 13, he is directed to appoint someone as Lieutenant Governor and could do it forthwith, and this would operate to make it impossible that the President pro tempore of the Senate would ever succeed to the performance of the duties of Governor as was clearly contemplated in the succession line to such duties as set out in section 15 of the Constitution.

The construction we give leaves effective the ineligibility of the elected Governor **to be or become Governor** for the term immediately succeeding that for which he was elected and served either in part or in whole, and does not extend the said ineligibility to an individual not specifically made ineligible by section 4. Again, should we give the meaning plaintiff contends for, we would make it possible to defeat such intent of section 4, in this, to wit: That the elected Governor, after serving for approximately three and one-half years, could resign before the primary, the Lieutenant Governor would then become automatically the constitutional Governor, and the Governor elected for the term then running thus, by his own act, making himself eligible to be Governor for the next term. could forthwith enter the race, and if elected, would be qualified, for that he would not be immediately succeeding himself, a constitutional Governor having served in the interim. Likewise, in the instant case, if M. E. Trapp is Governor in the constitutional sense of the term, he could forthwith appoint a Lieutenant Governor, then resign; his appointee would then be the constitutional Governor, and Trapp could continue his campaign, and if elected, could qualify as Governor the second Monday in January, 1927, for the reason that he would not be "immediately succeeding himself." but another constitutional Governor would have filled the office in the interim. No such possibility of juggling with this high office was even intended, but when all provisions are considered, the Constitution means that if "A" is honored by being elected Governor for a term of four years, he is ineligible to be Governor the next term. which begins four years later. That is what the Constitution says, and it means that and nothing more. That meaning prevents possible and probable unseemly and disconcerting conditions, and we must adhere to it.

We are driven to these conclusions: First, that under the Constitution of Oklahoma. there cannot be a constitutional Governor, except when elected as such by the electors of the state. Second, that under section 1, executive authority is vested in both the Governor and the Lieutenant Governor, but

that under section 2 supreme executive authority is vested in the Governor, and the Lieutenant Governor cannot exercise executive authority until a contingency arises, as set forth in sections 15 and 16 of said article. Third, that under said sections a vacancy may occur and exist in the office of Governor, in which event the Lieutenant Governor, as such, exercises the executive authority which the Governor, but for the arising of the contingency, would have exercised. Fourth, that if while so exercising such authority, the Lieutenant Governor is impeached, displaced, resigns, dies, or is absent from the state, etc., the President pro tempore of the Senate may perform such duties. Fifth, that the Lieutenant Governor who runs and is elected, as such, cannot by operation of law be made a constitutional Governor, but is merely a constitutional Lieutenant Governor, and may exercise executive authority when the Chief Executive, to wit, the Governor, is removed, dies, or cannot otherwise act. Sixth, that this construction gives force to the language of section 1, section 2, section 4, section 13, section 15, section 16, which are all the sections dealing with the subject, and thereby creates no possibility of a confusion in the performance of the executive functions; neither does it destroy nor strike down the succession provided by section 15 of said article to the duties of the office of the executive, such as might occur otherwise.

We think our reasons and conclusions are borne out by these cases: State v. La Grave (Nev.) 45 Pac. 243; State ex rel. Hardin v. Sadler (Nev.) 47 Pac. 450; People v. Cornforth (Colo.) 81 Pac. 871; State v. Meller (N. J.) 57 L. R. A. 312; People v. Budd (Cal.) 45 Pac. 1060; State v. McBride (Wash.) 70 Pac. 25; State ex rel. Chatterton v. Grant (Wyo.) 73 Pac. 470; Clifford v. Hiller (N. J. Law) 42 Atl. 155; Futtrell v. Oldham (Ark.) 155 S. W. 502.

In the above cited case of People v. Budd (Cal.) 45 Pac. 1060, the court, in part, says:

"It will be seen that in case of a vacancy in the office of Governor the vacancy is not to be filled, but the powers and duties devolve upon the Lieutenant Governor, who does not cease to be Lieutenant Governor. Under such circumstances, it would hardly be contended that when the powers and duties of the Governor devolve upon the Lieutenant Governor, the latter thereby becomes Governor and can appoint a Lieutenant Governor. Nor do I think it could be contended that when the President pro tempore of the Senate acts as Governor he could appoint a person to fill the vacancy in the office of Lieutenant Governor. If he could,

he would then appoint himself out of office, and it would be his duty to do so."

Again, if we consider sections 15 and 16 separately instead of together, do we find anything in section 16 which authorizes M. E. Trapp to be governor? Under the facts as they were and are, can we not see by an analysis of that section that when Trapp began to perform the duties of the office, it was not as Governor? No one contends for a moment that mere inability or disability on the part of the elected Governor would make the Lieutenant Governor Governor in fact. Under this section 16 the first thing mentioned is, "In case of impeachment of the Governor * * * the office 'devolves,' etc., upon the Lieutenant Governor."

What does impeachment mean? And could impeachment have made Trapp Governor? It certainly could if the word "devolve" means what plaintiff contends, for he says that is the one word which made Trapp Governor. This court has definitely said through Justice Harrison in the case of State ex rel. Trapp v. Chambers, District Judge, 96 Okla. 78, 220 Pac. 890, that:

"'Impeachment' of the Governor within the meaning of section 16, article 6, of the Constitution, is the adoption of articles of impeachment by the House of Representatives, and the presentation thereof to the Senate, and the indication by that body that the same are accepted for the purpose of permitting prosecution thereof, and the impeachment of the Governor operates to suspend him; the duties and emoluments of the office automatically devolving upon the Lieutenant Governor for the remainder of the term or until the disability is removed by the acquittal of the Governor of the charges preferred against him."

So the word "devolve," clearly from said opinion, did not make Trapp Governor while impeachment charges were pending against Walton, for this court said there: "The duties and emoluments" of the Governor "devolved" upon Trapp.

The second contingency set out in section 16 is in case of death, the office "devolves." Walton was not then and is not now dead, so "devolve" did not make Trapp Governor under that contingency. The third is in case of his failure to qualify, the office "devolves." Walton did not fail to qualify, and "devolve" could not make Trapp Governor under that contingency. The fourth contingency is in case of resignation, the office "devolves." "Devolve" did not make him Governor for this reason, for Walton did not resign. The fifth contingency is in case of his removal from the state the office "de-

volves." Walton did not remove from the state, so that contingency not having taken place, "devolve" did not make Trapp Governor. The sixth and last contingency of said section 16 is in case of **inability to discharge the powers and duties of the office,** the office "devolves" upon the Lieutenant Governor "until the disability is removed." This contingency did not permit "devolve" to make Trapp Governor, for there was no "inability" on the part of Walton to discharge the powers and duties of Governor, for that "inability" is a condition that may be removed or terminated, or, in other words, is temporary. It is defined by lexicographers as "an inherent lack of power to perform the thing in question." An illustration would seem to make it clear. For instance, if Walton had been afflicted with insanity, this would have brought about a lack of power to perform the duties of the office which inhered in him personally, and such inability as might be removed just as acquittal on the impeachment charges would have restored him to the right to perform the duties of the office.

Section 16 was given this meaning as far back as 1913, by Judge Henry Furman, a man of recognized learning and a judge of eminent ability. In the case of Ex parte Hawkins. 10 Okla. Cr. 396, 136 Pac. 991, he said:

"The case presents simply a cold question of law and must be decided as such without reference to any other considerations. Article 6, section 16 (sec. 165, Williams' Constitution), provides in express terms that all of the powers of the Governor shall devolve upon the Lieutenant Governor during the in-ability of the Governor to discharge the powers and duties of said office and until such disability shall be removed. * * * The Governor may go to other states * * * without forfeiting his office * * * During his absence or inability to act, the Lieutenant Governer is vested with all of the powers of Governor. * * * The Constitution provides that there shall always be some one within the state clothed with the power to perform the duties of Chief Executive. * * * The powers of the Lieutenant Governor to act, during the inability of the Governor, are not derived from the invitation or request of the Governor, but they rest alone upon the provisions of the Constitution of Oklahoma."

This comes from the pen of one long since removed from divergent judicial and political views. He was discussing the identical section of the Constitution **plaintiff relies** on as making a Governor out of a Lieutenant Governor. Judge Furman said, in brief, that during an inability of the Governor to act, the Lieutenant Governor came forward, not to say "I am Governor," but to do the work and perform the duties which the Governor would have done but for the inability.

This shows clearly the futility of considering section 16 separate from sections 1 and 15 of the same article.

Plaintiff admitted in oral argument that section 15 should come after section 16; that this mistake was made in enrolling the article by the enrolling clerk. This is only important, if at all, in reading the two sections together. If they are so read, in the light of the above authorities, they will in substance be: When the Governor has impeachment charges pending against him, fails to qualify, resigns, removes from the state, or possesses inability to act, or (sec. 15) if during a vacancy of the office of Governor, from any of the above causes which would create a vacancy, or from death, or removal by a judgment of a court of impeachment, the duties and powers of the Governor are held and performed by the Lieutenant Governor, and if during such vacancy the Lieutenant Governor suffers impeachment or removal from office or inability to act, the President pro tempore of the Senate shall perform the duties, then the Speaker of the House, and then such other person as the Legislature may provide by law.

Section 168, C. O. S. 1921, on impeachments, provides in closing:

"If two-thirds of the Senators present shall vote yea upon any charge or count contained in the article of impeachment, the accused shall be adjudged guilty (by the Senate as a court of impeachment—ours) and the judgment of the court shall be that he be removed from office."

That is what created the **vacancy in the office of Governor in the present term,** and was such a vacancy in such office as is referred to in section 15 of article 6 of the Constitution, and during which that section and section 16 require that the Lieutenant Governor shall have the power and perform the duties of the office and such of them as would otherwise be required of the Governor. It was such contingency actually occurring which was anticipated by the Constitution as the reason for vesting executive authority in the Lieutenant Governor in section 1 of the same article clearly to be exercised on the contingencies set out in sections 15 and 16.

We feel that the usage grown up in departmental construction of the national government that on a vacancy in the office of the elected President the Vice President becomes President is not even persuasive here,

for there is nothing in the Constitution of the United States that makes the elected President, or a successor to him, ineligible to succeed himself, and the question here could never arise as to the presidency.

It must be noted in conclusion that not one decided case from all the states is cited to support the opinion of the court on the question here involved, though there are numerous ones, as set out above, on similar questions.

The writer believes the judgment of the trial court should be affirmed.